```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION


 3

     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
 4                                    )
                                      )
 5    UNITED STATES OF AMERICA        )
                                      )
 6    v.                              )   Criminal No.
                                      )   3:16CR139
 7    RICHARD TODD HAAS               )
                                      )   February 8, 2017
 8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

 9

10

11        COMPLETE TRANSCRIPT OF MOTION TO SUPPRESS
            BEFORE THE HONORABLE ROBERT E. PAYNE
12               UNITED STATES DISTRICT JUDGE

13

14

15    APPEARANCES:

16    Heather Hart Mansfield, Asst. United States Attorney
      Office of the U.S. Attorney
17    SunTrust Building
      919 East Main Street, Suite 1900
18    Richmond, Virginia   23219

19         Counsel for the United States

20    Valencia D. Roberts, Asst. Federal Public Defender
      Office of the Federal Public Defender
21    701 E. Broad Street, Suite 3600
      Richmond, Virginia   23219
22
           Counsel for the Defendant
23

24             DIANE J. DAFFRON, RPR
              OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

I N D E X

|                   | DIRECT | CROSS | REDIRECT |
|-------------------|--------|-------|----------|
| Melvin Gonzalez   | 9      | 55    | 58       |

E X H I B I T S

DEFENDANT'S EXHIBITS:                                        Page

| A | Search warrant                       | 5  |
|---|--------------------------------------|----|
| B | Search warrant                       | 5  |
| C | Search warrant return                | 5  |
| D | Transcript of phone calls 8-14-16    | 53 |
| E | Transcript of phone calls 8-16-16    | 53 |
| F | Stipulations                         | 54 |
| G | Text messages                        | 61 |

1      (The proceedings in this matter commenced at

2  10:10 a.m.)

3

4      THE CLERK:   Case No. 3:16CR139, the United

5  States of America versus Richard Todd Haas.

6      The United States is represented by Heather

7  Mansfield.   The defendant is represented by Valencia

8  Roberts and Carolyn Grady.

9      Are counsel ready to proceed?

10      MS. MANSFIELD:   The United States is ready,

11  Your Honor.

12      MS. ROBERTS:   The defense is ready.

13      THE COURT:   All right.   I have reviewed the

14  papers.   Do you have anything to say on whether a

15  *Franks* hearing is required other than what you've said

16  in your papers?

17      MS. ROBERTS:   No, Your Honor.

18      THE COURT:   Ms. Mansfield, do you have

19  anything to say other than what you've said in your

20  papers on whether a *Franks* hearing is required?

21      MS. MANSFIELD:   Nothing, Your Honor, in

22  addition to what we have said in our papers.

23      THE COURT:   All right.   I find that the

24  showing required for a *Franks* hearing has not been

25  made and therefore there is no need for a *Franks*

1   hearing.

2        All right.  Is there any evidence on the

3   issue itself underlying the validity vel non of the

4   search warrant?

5        MS. MANSFIELD:  Your Honor, the parties have

6   stipulated to the search warrants coming in that the

7   government attached to its responses, Government's

8   Exhibits A and B, respectively.  So the government at

9   this time would have no additional evidence as to the

10  validity of the search warrants on the *Doyle* issue and

11  the nexus issue.  Only argument.

12       THE COURT:  What evidence do you have?

13  Anything?

14       MS. ROBERTS:  Yes, Your Honor.

15       THE COURT:  You agree Government's Exhibit A

16  and B can come in?

17       MS. ROBERTS:  Your Honor --

18       THE COURT:  Do you agree that A and B can

19  come in?  She said you stipulated.  Do you agree?

20  Looks like you attached them to your papers, too.

21       MS. ROBERTS:  I did, Your Honor.

22       THE COURT:  The answer is yes, they can come

23  in, right?

24       MS. ROBERTS:  The government is not

25  presenting A and B.  Defense does have the warrants

1   and we're prepared to submit it to the Court.

2           MS. MANSFIELD:  As they were stipulated to,

3   Your Honor, there was a written stipulation.

4   Initially, they were marked as defense exhibits.  I'm

5   fine calling them Defense A and B or Government's A

6   and B.

7           THE COURT:  We will call them Defendant's

8   Exhibits A and B.  They are admitted.

9           (Defendant's Exhibits A and B are entered

10  into evidence.)

11          THE COURT:  All right.  Any other evidence?

12          MS. ROBERTS:  Your Honor --

13          THE COURT:  Yes or no?  Is there any more

14  evidence?

15          MS. ROBERTS:  Yes, Your Honor, there is

16  additional evidence.

17          THE COURT:  What is it?

18          MS. ROBERTS:  Your Honor, with regards to the

19  additional evidence, we would, through testimony,

20  present evidence showing --

21          THE COURT:  Excuse me.  Who are you going to

22  call as your witnesses?

23          MS. ROBERTS:  Agent Gonzalez, Your Honor.

24          THE COURT:  What are you going to have him

25  testify to?

1      MS. ROBERTS:  Your Honor, Agent Gonzalez will

2  provide testimony to the Court with regards to the

3  reliability of the confidential informant and what

4  information --

5      THE COURT:  What difference does that make at

6  this stage?  Don't you determine the fact of the

7  reliability of the informant based on what's in the

8  application?

9      MS. ROBERTS:  Yes, Your Honor, but it's our

10  purpose to demonstrate that there was far more

11  information known to Agent Gonzalez that suggest the

12  unreliability --

13      THE COURT:  What difference does that make if

14  what is known suggests it?  That's what I'm trying to

15  get at.

16      MS. ROBERTS:  Your Honor, the difference that

17  it makes is that if the agent knew of information and

18  intentionally left it out --

19      THE COURT:  That's a *Franks* issue.  I've held

20  that you haven't made the showing on that.

21      MS. ROBERTS:  Your Honor, it's also a prong

22  with regards to the good faith exception in *Leon* where

23  information that the affiant knew was false or would

24  have known was false --

25      THE COURT:  False is different than omitted.

1    You're saying he omitted something, not that he made

2    something false.

3              MS. ROBERTS:  Or reckless disregard.

4              THE COURT:  I'll hear the evidence, but I'm

5    going to tell you something.  Neither one of you have

6    put the issue into proper focus.  Get the evidence on

7    so I can get the hearing accomplished.  And get right

8    straight to it, please.

9              MS. ROBERTS:  Yes, Your Honor.

10             Your Honor, I would call Agent Gonzalez to

11   the stand.

12             THE COURT:  Is that the only witness you

13   have?

14             MS. ROBERTS:  That's the only witness we

15   anticipate, Your Honor.

16             Your Honor, pursuant to Rule 611(c)(2), I

17   would ask the Court for permission to treat Agent

18   Gonzalez as an adverse party or witness identified as

19   an adverse party.  As such, we would ask the Court to

20   allow me to examine him using leading questions.

21             THE COURT:  I'm waiting.

22             MS. MANSFIELD:  I guess, Your Honor, at this

23   point in this proceeding I would object to that.  I

24   don't believe there's any basis.  We haven't even

25   begun the questioning of Agent Gonzalez yet to treat

1   him as an adverse or hostile party.

2          MS. ROBERTS:  Your Honor, I'm not seeking to

3   treat him as hostile, but Rule 611(c) says that,

4   "Leading questions should not be used on direct

5   examination except as necessary to develop the

6   witness's testimony.  Ordinarily, the Court should

7   allow leading questions:

8              (1) on cross-examination; and

9              (2) when a party calls a hostile witness, an

10  adverse party, or a witness identified with an adverse

11  party."

12         Agent Gonzalez is -- it is my position that

13  he is a witness identified --

14         THE COURT:  Why are you standing here arguing

15  all this?

16         MS. ROBERTS:  Your Honor, because I intended

17  to --

18         THE COURT:  I thought the rule says that

19  rules of evidence don't apply in these proceedings

20  necessarily.

21         MS. ROBERTS:  I don't understand the Court's

22  question.  My request --

23         THE COURT:  This is a preliminary hearing,

24  the status to which the rules of evidence don't apply,

25  is it not?

1           MS. ROBERTS:  In which case, Your Honor, I

2    would say --

3           THE COURT:  In which case, you would say you

4    did not even need to make the motion.  You just go

5    ahead and ask the questions.

6           MS. ROBERTS:  Yes, Your Honor.

7           THE COURT:  That's what you usually do.

8

9       MELVIN GONZALEZ, called by the Defendant, first

10   being duly sworn, testified as follows:

11       DIRECT EXAMINATION

12   BY MS. ROBERTS:

13   Q   Would you please state your full name for the

14   Court?

15   A   Melvin Gonzalez.

16   Q   Agent Gonzalez, how are you employed?

17   A   I'm a special agent with the FBI assigned to the

18   Richmond Field Office.

19   Q   Agent Gonzalez, how long have you been employed

20   with the FBI?

21   A   It's been over 11 years.

22   Q   Agent Gonzalez, do you lead investigations in all

23   areas, in all subject matters, or do you have a

24   particularized area in which you investigate crimes?

25   A   I have previously worked in another division,

1    cases involving violent crimes, corruption, drug

2    trafficking.  Here in Richmond I'm assigned to the

3    Child Exploitation Task Force.  I work sex trafficking

4    cases involving children and child pornography.

5    Q    How long have you been working this particular

6    assignment with sex trafficking and child exploitation

7    in the Richmond Division?

8    A    It's been a little over two years.

9              THE COURT:  I think the issue you wanted to

10   develop was what knowledge he had about the

11   reliability about the informant in this case.  Can we

12   get right to that?

13   BY MS. ROBERTS:

14   Q    Agent Gonzalez, when did you first meet the

15   individual identified in the affidavit as CW?

16   A    It was in June 2016.

17   Q    Prior to the meeting, was CW an individual known

18   to you?

19   A    No.

20   Q    Was CW working with another law enforcement

21   officer or agent associated with this investigation?

22   A    Not with this investigation.  She had previously

23   worked with the FBI out of the Norfolk Division.

24             THE COURT:  As what?  As an employee or what?

25             THE WITNESS:  She was a witness to child

 1  exploitation investigations in that division.

 2          THE COURT:  So she didn't work for the FBI?

 3          THE WITNESS:  No.

 4          THE COURT:  She was a witness --

 5          THE WITNESS:  She was a witness.

 6          THE COURT:  Wait a minute.  She was a witness

 7  in a case being investigated by the FBI; is that what

 8  you're saying?

 9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  All right.

11  BY MS. ROBERTS:

12  Q   Agent Gonzalez, you failed to include that

13  information in the affidavit; is that correct?

14  A   I believe it was not included in the affidavit

15  that she had been a previous witness.

16  Q   When CW came to you --

17          THE COURT:  That was in two cases or one?

18          THE WITNESS:  I'm sure it was one case that

19  she assisted in.  She had previously provided

20  information to the Norfolk Division in other matters,

21  but she was a witness to one case.

22          THE COURT:  Did you know all this in

23  June 2016 when you applied for the warrant or have you

24  learned it since?

25          THE WITNESS:  When we met with the agent and

1   the informant in Norfolk on June, I believe the 16th,

2   the special agent advised us that she had previously

3   been a witness on a case -- in a case in the Norfolk

4   Division, a previous witness.

5           THE COURT:  Then you went on to say in

6   addition to that that she had given other information

7   in the Norfolk office to the FBI.  Did you know that

8   when you applied for the search warrant or did you

9   learn that on the day you interviewed her?

10          THE WITNESS:  No, we -- I learned that

11  through the investigation after.

12          THE COURT:  Before or after the search

13  warrant?

14          THE WITNESS:  It was after the search

15  warrant.

16          THE COURT:  All right.  But as of the time of

17  the search warrant, you knew she had been a witness in

18  one case or two cases?

19          THE WITNESS:  In one case, Your Honor.

20          THE COURT:  Okay.  In one case in Norfolk and

21  it was child exploitation.

22          THE WITNESS:  It was a child exploitation sex

23  trafficking matter.

24          THE COURT:  Okay.  And she testified in

25  court?

1        THE WITNESS:  I believe so, but I don't have

2   any details towards her testimony or her part in the

3   investigation.

4        THE COURT:  And you learned this from an FBI

5   agent?

6        THE WITNESS:  Yes, Your Honor.

7        THE COURT:  And you didn't put it in your

8   affidavit?

9        THE WITNESS:  No, it was not included in the

10  affidavit.  I believe it was not.

11       THE COURT:  All right.  All right.  Go ahead.

12       MS. ROBERTS:  I did have one question

13  prompted by your question of the agent.

14  BY MS. ROBERTS:

15  Q   With regards to testifying in the Norfolk matter,

16  is it your testimony that you do not know whether or

17  not she testified?

18  A   I do not know if she testified or not.

19  Q   Okay.  Now, when CW came to you with the

20  information regarding her observing child pornography

21  on Mr. Haas's laptop in May 2004, did you take -- what

22  measures, if any, did you --

23       THE COURT:  May 2004?

24       MS. ROBERTS:  I'm sorry.

25  Q   May 2016.  What measures, if any, did you take to

1    verify that information?

2    A    After she provided the information, we

3    corroborated Mr. Haas's identity with the CW.   She

4    provided his phone number.   We conducted subpoenas.

5    We collected records, and when we met with her, we

6    displayed his photo.   She fully identified him.   And

7    after that we conducted our normal record checks, and

8    we --

9              THE COURT:   Record check of the witness?

10             THE WITNESS:   No, of the subject involved in

11   the investigation, not the witness.

12   BY MS. ROBERTS:

13   Q    And through these record checks, the information

14   that you were able to verify were basic pieces of

15   information such as his name, and date of birth, and

16   address; is that right?

17   A    Addresses, businesses, associates.

18   Q    You were not able to verify any of the information

19   that went to the specific allegation made regarding

20   his possession of child pornography; is that right?

21   A    Well --

22   Q    Through --

23             THE COURT:   Him or the witness?   What are you

24   talking about?   We're talking about the reliability of

25   the witness.

1          MS. ROBERTS:  Yes, Your Honor, but I'm asking

2    what measures the agent took.  He said that he

3    verified basic information; name, social security

4    number, address.

5          THE COURT:  Just ask the question again.

6          THE WITNESS:  Do you want me to explain what

7    we did before we wrote the affidavit?

8    Q    No.  I wanted you to explain what specific

9    measures did you take to verify the allegation that he

10   possessed child pornography in May of 2016.

11   A    Well, we met with our CW after that in July 21,

12   and she provided additional details that she had

13   continued texting with Mr. Haas, and they were engaged

14   in multiple telephone calls, that he had continued to

15   approach the idea of producing child pornography with

16   a child that -- or CW was going to provide.  That he

17   also had a child who he can bring into the production

18   of child pornography and was requesting our CW to

19   engage in sex with the child in order for him to

20   produce the child pornography.

21         Before we wrote the affidavit, we conducted -- it

22   was August 12.  We did an attempt consensual telephone

23   call.  It didn't go through, but Mr. Haas did text our

24   CW after the attempt.  We provided a recording device

25   for CW, and she was able to conduct two consensual

1  recordings of telephone calls.  These calls were calls

2  from Mr. Haas to our CW.

3      During these calls, they clearly discuss the plan

4  to meet and produce child pornography.  And based on

5  that information and the information previously

6  provided, we wrote an affidavit.

7  Q   So if I can stop you for a minute and back you up,

8  Agent Gonzalez.  With regards to the two conversations

9  that the CW alleged occurred between Mr. Haas and

10 herself in June of 2016, those were not recorded; is

11 that correct?

12 A   Yes, they were.  I'm sorry?  In --

13         THE COURT:  Why don't you get the dates and

14 be specific.

15         THE WITNESS:  Yes, I'm sorry.  The telephone

16 calls recorded were in August.  I'm sorry.

17 Q   Right.  So the two conversations that allegedly

18 occurred in June, those dates weren't specified by the

19 CW, correct?  She didn't give specific dates as to

20 when those conversations allegedly occurred?

21 A   Which conversations?  When they first -- they

22 first met in May.  According to our CW, they met in

23 May.

24         THE COURT:  Is that on the telephone or in

25 person?

GONZALEZ - DIRECT                17

1          THE WITNESS:  No, Mr. Haas called our CW.

2          THE COURT:  On the telephone?

3          THE WITNESS:  She's an escort.  She's a

4   prostitute.  He responded to an ad she had posted on

5   Backpage.  They agreed to meet.  Our CW met Mr. Haas

6   at his residence, and this took place sometime in May.

7   BY MS. ROBERTS:

8   Q    Right.  My question is --

9          THE COURT:  Go on.

10          MS. ROBERTS:  I'm sorry?

11          THE COURT:  I want to hear the rest of this

12   so I understand it.

13          THE WITNESS:  So after --

14          THE COURT:  Met in May and then what

15   happened?

16          THE WITNESS:  They met in May.  In May,

17   that's when Mr. Haas displayed the computer.  It was a

18   laptop that contained numerous images of child

19   pornography.  And the witness described the images.

20   She said they were young, female, from the ages

21   probably five to early teens, probably 12 years old.

22   They were all engaged in sexual acts.  Multiple

23   pictures were of multiple girls in a bed at the same

24   time with an adult male.  They were being penetrated.

25   So she was very descriptive of the photos that she

1   observed.

2           THE COURT:  Excuse me.  This viewing of the

3   computer, the viewing was on the computer.  Was that

4   in the house, the defendant's house?

5           THE WITNESS:  That was in the defendant's

6   house according to the CW.

7           THE COURT:  All right.  Excuse me.  Go ahead,

8   Ms. Roberts.

9   BY MS. ROBERTS:

10  Q   So as it relates to the June 2016 phone calls that

11  CW reported having occurred between Mr. Haas and

12  herself, those calls, those June calls, and the

13  substance, those were not recorded, correct?

14  A   The months of June and July, they were not

15  recorded, but we did obtain telephone records which

16  indicated hundreds of calls between them and text

17  messages.

18          THE COURT:  Between who?

19          THE WITNESS:  Between our CW and Mr. Haas.

20  BY MS. ROBERTS:

21  Q   And with regards to the text messages, you

22  actually were able to obtain the substance of the text

23  messages; is that correct?

24  A   Partially.

25  Q   In the substance of the text messages, they did

1   not mention underage females specifically, correct?

2   A    They did not.  I would assume they would not do

3   such a thing.

4   Q    They didn't contain or make mention of underage

5   females.  That's a correct statement?

6   A    Not in text messages, no.

7   Q    Okay.  And the text messages contained no mention

8   of child pornography, correct?

9   A    Not in the text messages.

10  Q    Okay.  And in the text messages, they did make

11  clear that Mr. Haas and the CW were currently engaged

12  in sexual relations among one another, correct?

13  A    It appeared that they were in some way engaged in

14  sex, in sexual acts.  She is a prostitute and he was

15  her client.

16  Q    And the substance of these text messages indicate

17  that CW would reach out to Mr. Haas and/or Mr. Haas

18  would reach out to CW for the purpose of the two of

19  them hooking up for sex; is that correct?

20  A    I believe so, but they did not -- after their

21  encounter in May, according to our CW they did not

22  engage in any additional sex acts.

23  Q    According to the CW?

24  A    According to the CW, they did not.  They met in

25  person one time in July, and Mr. Haas provided some

1   money to our witness and continued to request and --

2   to request photos of the alleged 12-year-old that we

3   obviously made up, and he discussed his plan to

4   produce child pornography with the child.

5   Q    And the text messages, going back to the text

6   messages, the text messages contained no discussion of

7   youth, correct?

8   A    I already said no.

9   Q    No discussion of nude pictures of children,

10  correct?

11  A    It was not discussed during the text messages,

12  only through the consensual recordings.

13  Q    So in fact there was nothing in the substance of

14  the text messages that you reviewed that would lead

15  you or that would -- there was nothing in the

16  substance of the text messages that connected the

17  conduct?

18         THE COURT:  Text messages in May?

19         MS. ROBERTS:  No.  The text messages in June

20  and July.

21  Q    There was nothing in the substance of those text

22  messages that would have indicated to you Mr. Haas's

23  interest in child pornography, correct?

24  A    It didn't mention anything regarding child

25  pornography.

1          THE COURT:  I think we've been through this

2    six times now, and I don't want any more of it.  I've

3    heard enough.  I understand what he says, and it's not

4    going to change.  It's been repeated, repeated,

5    repeated.  So move on.

6    BY MS. ROBERTS:

7    Q    If I go back to the confidential witness's

8    criminal history, did you -- after you met her in June

9    of 2016, did you run a criminal history check?

10   A    No.

11   Q    Of the CW?

12   A    No, we did not.

13   Q    Prior to swearing out the affidavit, did you?

14   A    No, we did not.

15   Q    Prior to swearing out the affidavit, did you run a

16   criminal history check of the CW?

17   A    No, we did not.

18   Q    Did you run a check of the CW's driving history?

19          THE COURT:  Driving?

20          MS. ROBERTS:  Yes, Your Honor.

21          THE COURT:  What's that have to do with?

22          THE WITNESS:  I don't think so.  We ran her

23   CLEAR report.

24          THE COURT:  What's that?

25          THE WITNESS:  CLEAR, just to obtain her

 1   address and personal information.

 2           THE COURT:   What does CLEAR mean?

 3           THE WITNESS:   CLEAR is just a software that

 4   we use.   It's like Accurint.

 5           THE COURT:   You may think that I know that,

 6   but you'd be wrong.   So tell me what it is.

 7           THE WITNESS:   It's just a software that we

 8   log into and we run names and biographical information

 9   to obtain addresses.   We can run comprehensive

10   reports.

11           THE COURT:   Does it produce criminal

12   histories?

13           THE WITNESS:   Only if we order a full

14   comprehensive report with criminal history.

15           THE COURT:   It's capable of it?

16           THE WITNESS:   It's capable.

17           THE COURT:   But you didn't do it?

18           THE WITNESS:   No.   And it won't give you full

19   details.   It would only say that X person has a

20   criminal record or a court case in X, Y state.

21   BY MS. ROBERTS:

22   Q   Agent Gonzalez, when you swore out the affidavit

23   in August of 2016, you were aware that the CW had been

24   convicted of a felony in Chesapeake in 2012, correct?

25           THE COURT:   Excuse me.   The question is what

GONZALEZ - DIRECT                23

1   you were aware of at the time you swore out the

2   warrant.

3           THE WITNESS:  She advised that she had been

4   arrested in Virginia Beach for prostitution.  And when

5   we swore out the affidavit in -- in September, you

6   said?

7   BY MS. ROBERTS:

8   Q    No.  You swore the affidavit, the first affidavit

9   was sworn on August 31st, 2016 --

10  A    August 31st.

11  Q    -- is that correct?

12  A    Yes.  We were aware that she had been charged also

13  in Henrico with a felony.

14  Q    My question to you, Agent Gonzalez, is were you

15  aware on August 31st when you swore the first

16  affidavit that the CW had been convicted in 2012 of a

17  felony offense in Chesapeake, Virginia?

18  A    No, no, no.

19  Q    When you swore out the affidavit first on

20  August 31st and then on September 1st of 2016, were

21  you aware that the CW was on felony probation

22  supervision with the State of Virginia?

23  A    Yes.

24  Q    And you didn't include that information in the

25  affidavit, correct?

1  A    No.

2          THE COURT:  Excuse me.  You knew then that

3  she was on -- I don't know what felony probation

4  means.  You knew if she was on probation, she had been

5  convicted of some offense; is that right?

6          THE WITNESS:  Yes.

7          THE COURT:  What offense did you know she'd

8  been convicted of to get her on probation?

9          THE WITNESS:  She said that she was driving

10 without a license in Virginia Beach, and she was

11 arrested.  And this took place in -- we had a meeting

12 with her in July, and she advised that she had been

13 pulled over by a police officer in Henrico, that she

14 was not supposed to be driving, so she provided false

15 information to a police officer.  And when we got

16 involved in that, we then were aware that she was

17 actually in probation, and I believe she was in

18 probation -- it was something related to Virginia

19 Beach.  I don't know if it was the driving without the

20 license or she was -- because we know and we knew back

21 then that she was involved in prostitution --

22          THE COURT:  Whoa, whoa, whoa.  I'm just lost

23 with all this.  Now, the question is:  As of

24 August 31, 2016, did you know she had been convicted

25 of a felony in 2012 in Chesapeake?  And your answer to

1    that was, no, you didn't know that.  Right?

2          THE WITNESS:  Not the 2012 felony.  I knew

3    she had a --

4          THE COURT:  Just a moment.

5          THE WITNESS:  Okay.

6          THE COURT:  But you knew she was -- as of the

7    time of the affidavit, you knew she was on probation.

8          THE WITNESS:  Yes.

9          THE COURT:  Then you said that she told you

10   that she was on probation for driving without a

11   license in Virginia Beach.  And then you mention

12   something about lying to a police officer in Henrico

13   where she was arrested for driving without a license.

14   To me, that's somewhat inconsistent.  So I want you to

15   clarify that.  Take it one at a time.

16         THE WITNESS:  Okay.

17         THE COURT:  You knew she was on probation as

18   of the time you executed the affidavit, right?

19         THE WITNESS:  Yes.

20         THE COURT:  What was the offense for which

21   she was on probation?

22         THE WITNESS:  Well, I thought it had to be

23   something related to prostitution, but we did not run

24   her criminal record until January of 2017 when the

25   AUSAs requested it.

GONZALEZ - DIRECT                    26

1      THE COURT:  That's not the question I asked

2  you.  What offense did you know she was on probation

3  for?

4      THE WITNESS:  I don't know what she was on

5  probation for.

6      THE COURT:  So you never verified that?

7      THE WITNESS:  No.

8      THE COURT:  Okay.

9  BY MS. ROBERTS:

10  Q   And, Agent Gonzalez, did I understand you to say

11  that CW told you she was on probation for a

12  prostitution offense?

13  A   No.

14  Q   In Virginia Beach?

15  A   No.  She advised she had been previously arrested

16  for prostitution and that she was on probation, but

17  she never said she was on probation for prostitution

18  or for driving without a license.  She did not have a

19  license.  That's what she said.

20      THE COURT:  Well, what is this all about?

21      MS. ROBERTS:  Your Honor, I'm going straight

22  to the Henrico false statement right now.

23      THE COURT:  You're not going anywhere until I

24  understand basically what he just said.  Excuse me.  I

25  have to understand that.

1             It's very important that I know what you knew

2    in August of 2016, not what you found out in January

3    of 2017 or later.  If somebody wants to develop that,

4    they can develop it.  Right now we're talking about

5    2016.

6             THE WITNESS:  Uh-huh.

7             THE COURT:  So 2016, right?

8             THE WITNESS:  Yes, Your Honor.

9             THE COURT:  You did not know of the felony

10   2012 conviction in Chesapeake?

11            THE WITNESS:  No.

12            THE COURT:  In August of 2016, before you did

13   the search warrant affidavit for the house, you knew

14   from her that she was on probation?

15            THE WITNESS:  Yes, Your Honor.

16            THE COURT:  And you learned that from her

17   when?

18            THE WITNESS:  I learned that from her

19   July 21.

20            THE COURT:  All right.  Did you ever

21   thereafter before you issued the affidavit search

22   warrant determine what the offense was for which she

23   was on probation?

24            THE WITNESS:  No, Your Honor.

25            THE COURT:  Now, you mention the confidential

GONZALEZ – DIRECT                    28

1  witness had told you she had been arrested for

2  prostitution.  When did she tell you that?

3        THE WITNESS:  During the course of the

4  investigation when we talked to her, but I don't

5  recall the exact date.

6        THE COURT:  Give me a month and a year.

7        THE WITNESS:  It was definitely before we

8  wrote the affidavit.

9        THE COURT:  Okay.  And she told you she was

10  arrested for prostitution?

11        THE WITNESS:  Yes, Your Honor.

12        THE COURT:  And is it from what you said

13  earlier, I understood you to say you assumed that the

14  reason she was on probation was because she had been

15  arrested for prostitution; is that what you assumed?

16        THE WITNESS:  I assumed that.

17        THE COURT:  You know as a law enforcement

18  officer that she could not have been on probation if

19  she weren't convicted.  You know that, don't you?

20        THE WITNESS:  Yes, Your Honor.

21        THE COURT:  So you also assumed that she had

22  been convicted of prostitution; is that right or not?

23  It had never crossed your mind?

24        THE WITNESS:  I didn't give importance to it.

25        THE COURT:  What?

 1          THE WITNESS:  I didn't think it was important

 2   at the time, so I didn't look into it.

 3          THE COURT:  Do you know whether prostitution

 4   for which she was arrested was a felony?

 5          THE WITNESS:  Well, we --

 6          THE COURT:  Did you know as of August 31,

 7   2016?

 8          THE WITNESS:  No, but we work along with

 9   vice, different vice groups, and we detain many

10   individuals that are involved in prostitution, and

11   they're not charged with felonies but charged with

12   misdemeanors, and their charges related to

13   prostitution but they're not felonies.  So I can't say

14   that I knew that she was on probation for a

15   prostitution charge.

16          THE COURT:  You just assumed that?

17          THE WITNESS:  I assumed it.

18          THE COURT:  At the time if you were arrested

19   on a misdemeanor probation charge and had been

20   convicted, could you be on probation as well?  Is

21   probation a permissible sentence for a misdemeanor

22   conviction for prostitution?

23          THE WITNESS:  I don't know.

24          THE COURT:  All right.  Go right ahead.  You

25   want to get into the Henrico thing?

1          MS. ROBERTS:  Yes, Your Honor.

2          THE COURT:  Let's get into the details.

3    BY MS. ROBERTS:

4    Q    Now, you met with CW on July 21st of 2016 in a

5    parking lot located here in the City of Richmond,

6    correct?

7    A    I believe it was Henrico.

8    Q    In Henrico, here in the general Richmond area,

9    correct?

10   A    Yes, ma'am.

11   Q    And the meeting is summarized in a report authored

12   by you dated September 1st, 2016, correct?

13   A    I would have to see the report.  Yes, this is the

14   report.

15   Q    And, Agent Gonzalez --

16          THE COURT:  Is that a 302?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Go on, now.

19   BY MS. ROBERTS:

20   Q    On that date, did the CW tell you that she had

21   been -- had an encounter with Henrico County Police

22   one week earlier on July 14, 2016?

23   A    She voluntarily advised us of that, yes.

24   Q    And did she tell you at that time -- did she tell

25   you on July 21st that when she had that encounter one

1  week prior that she provided a false statement to the

2  officer with regards to her identity?

3  A    Yes, she did.

4  Q    Did she also tell you that she provided

5  identifying information to the officer which belonged

6  to her sister?

7  A    Yes, she did.

8  Q    And when she provided that information to the

9  officer, did she tell you that she also signed her

10 sister's name to each of the summonses that were

11 issued?

12 A    I'm pretty sure she did.

13 Q    In fact, the Henrico police officer released her

14 on July 14, 2016, not knowing that she had forged the

15 uniform summons; is that correct?

16 A    Yes, that is correct.

17 Q    And all of this information you knew prior to your

18 swearing the affidavit for the search warrant on

19 August 31st, correct?

20 A    I knew the information, and I advised the

21 prosecutor of what was going on.

22 Q    But you failed to include that information in your

23 affidavit submitted to the magistrate on a

24 determination of probable cause, correct?

25 A    I didn't know I was obligated to include it in the

1   affidavit.

2   Q    Now, when CW was encountered by Henrico Police on

3   June 14th, she was cited for driving on a suspended

4   operator's license, correct?

5   A    That is correct.

6   Q    I'm sorry.  When she was encountered on July 14th,

7   correction to the date, by Henrico police officers,

8   she was cited for driving on a suspended operator's

9   license, correct?

10  A    Yes.

11  Q    Now, after CW told you that she'd lied to Henrico

12  police, did you give her any instructions with regards

13  to correcting or reporting her false statements?

14  A    I didn't have to give her instructions because she

15  voluntarily provided the information to us, and she

16  stated that she wanted to take care of it.  So I

17  contacted one of our Henrico P.D. TFOs and explained

18  what was going on.  He stated he was going to reach

19  out to the Commonwealth's Attorney Office.  He talked

20  to a Henrico prosecutor.  He got back with me and told

21  me that they had agreed to meet with her -- I think it

22  was the 25th that she had her next hearing.  So I did

23  not have to turn her in Friday or Thursday when she

24  released the information to us.

25       So on the 25th, I made sure that she got to the

1    court.  So we drove to a hotel where she was staying

2    at.  We picked her up.  We drove her to the Henrico

3    Court.  We walked her to the courtroom.  The TFO

4    obtained a felony arrest warrant for providing false

5    information.  She was charged.  She was not given bail

6    and she was held in jail.

7              THE COURT:  What's TFO?

8              THE WITNESS:  He's an FBI task force agent.

9              THE COURT:  She was charged with felony what?

10             THE WITNESS:  She was charged with a felony

11   that day.  I don't know the exact charges, but I guess

12   for providing false information to a police officer

13   who previously stopped her.

14             THE COURT:  And she then was detained as a

15   result of that charge?

16             THE WITNESS:  She was detained, yes, Your

17   Honor.

18             THE COURT:  And that happened in court in

19   Henrico?

20             THE WITNESS:  In Henrico, yes.

21             MS. ROBERTS:  One moment, Your Honor.

22             Thank you, Your Honor.

23   BY MS. ROBERTS:

24   Q    Agent Gonzalez, my question to you was whether or

25   not you advised CW to contact Henrico Police.

1        THE COURT:  He said that he did not have to

2   because she volunteered.  She told him she wanted to

3   make it straight, and he therefore helped her do that.

4   We heard him testify to that completely.  Let's go.

5   BY MS. ROBERTS:

6   Q   Agent Gonzalez, in the report that you authored

7   that summarized the interview of CW on July 14th, in

8   your report you state that agents advised CW that she

9   needed to clarify this with Henrico County Police; is

10  that correct?

11  A   Yes.

12        THE COURT:  That interview was, I thought you

13  said, was July 21.

14        THE WITNESS:  It was July 21.

15        MS. ROBERTS:  I'm sorry.  The July 21 was the

16  interview.

17        THE COURT:  Yeah.

18        MS. ROBERTS:  Yes, Your Honor.

19        THE COURT:  So you put the wrong date in the

20  question.  That's what I'm saying.  Let's just keep it

21  straight, please.

22        All right.  So in his 302, he said that he

23  told her what?

24        MS. ROBERTS:  That she needed to clarify

25  this.

 1              THE COURT:  Okay.

 2              MS. ROBERTS:  With Henrico County Police.

 3              THE COURT:  All right.  And that's in your

 4    302?

 5              THE WITNESS:  Yes.

 6              MS. ROBERTS:  Your Honor --

 7              THE WITNESS:  She voluntarily provided the

 8    information to us.  She asked us how she could fix it,

 9    and we told her that she needed to clarify it with

10    Henrico P.D.

11              THE COURT:  What he said before.

12              THE WITNESS:  We didn't instruct her to do

13    anything after that.  We picked her up and we

14    basically turned her in.

15    BY MS. ROBERTS:

16    Q    Agent Gonzalez, I've given you a copy of a

17    document.  Do you recognize that document?

18    A    Yes.

19    Q    And what do you recognize that document to be?

20    A    It's an FD-302.

21              THE COURT:  What we doing here?

22              MS. ROBERTS:  Your Honor, I'm about to move

23    the exhibit into evidence.

24              THE COURT:  Why?

25              MS. ROBERTS:  As Defense Exhibit --

GONZALEZ - DIRECT                    36

1          THE COURT:  As impeachment?

2          MS. ROBERTS:  Yes, Your Honor.

3          THE COURT:  All right.  Any objection?

4          MS. MANSFIELD:  Your Honor, I believe the

5    agent has asked and answered the questions.  I know

6    the rules of evidence don't, per se, apply, but I

7    think he's asked and answered the questions related to

8    what this says.  I don't think there's any need to

9    admit his report into evidence.

10          THE COURT:  It's not impeachment.  Objection

11   sustained.  He's answered the thing truthfully.  He

12   just didn't say it quite the way you wanted him to say

13   it.

14   BY MS. ROBERTS:

15   Q    Agent Gonzalez, you were aware that CW had a court

16   date for the Henrico matters prior to your swearing

17   the affidavit on August 31st; is that correct?

18   A    Which court?  Are we talking about the July 25th

19   or --

20          THE COURT:  He testified he took her to court

21   on July the 25th, and it was at that time that a

22   charge was pressed against her.  So obviously he knew

23   that she had the court date before August 31.  I mean,

24   that's clear.  So we don't need to explore that any

25   further.  Are you asking about something different?

GONZALEZ - DIRECT                    37

1          MS. ROBERTS:  Convictions, Your Honor.  I'm

2    sorry.

3          THE WITNESS:  It was during that time in

4    court that we were fully aware that she was on

5    probation.  And after that we didn't follow-up with

6    her on any of her charges or what happened with her in

7    Henrico.

8          THE COURT:  I think the question is:  When

9    you swore out the affidavit for the search warrant,

10   had she been convicted to your knowledge of the charge

11   for which she was arrested on the 25th of July?

12         THE WITNESS:  I believe she was not.

13         THE COURT:  Had not been convicted?

14         THE WITNESS:  Had not been.

15         THE COURT:  Okay.

16   BY MS. ROBERTS:

17   Q    Agent Gonzalez --

18         MS. ROBERTS:  One moment, Your Honor.

19   BY MS. ROBERTS:

20   Q    Agent Gonzalez, you've testified that prior to the

21   instant matter you had never used CW as an informant,

22   correct?  That's your testimony?

23         THE COURT:  I don't think he's testified

24   about whether he had used her at all yet in this

25   hearing.

1   BY MS. ROBERTS:

2   Q    Prior to the instant matter, had you ever used CW

3   as an informant?

4   A    No.  She was never open as an informant.  She's

5   addressed in our reports as a witness, a complainant.

6          THE COURT:  CW is a designation in the FBI

7   shorthand for witness.  CI is for confidential

8   informant; is that right?

9          THE WITNESS:  Yes, Your Honor.

10         THE COURT:  So your designations treat her as

11  CW, a witness; is that what you're saying?

12         THE WITNESS:  Yes, we treat witnesses very

13  differently than we treat informants.

14         MS. ROBERTS:  Okay.

15  BY MS. ROBERTS:

16  Q    And it was -- moving to the CW's statements

17  regarding the images on the laptop in May of 2016.

18  Did CW specify when exactly in May 2016 Mr. Haas

19  allegedly showed her the CP on his computer?

20  A    Not the exact date.  According to telephone

21  records, we know that they were in contact May 23,

22  2016, and thereafter many, many times.

23  Q    And you don't know whether or not they had been in

24  contact prior to May 23rd by some other means other

25  than telephone?

1  A   Well, the witness advised that she knew Mr. Haas

2  from like four years ago.  So they have known each

3  other for a while.  She provided escort services to

4  him prior to their meet in May 2016.

5           THE COURT:  When you say "escort services,"

6  are you saying she serviced him as a prostitute?

7           THE WITNESS:  Yes, Your Honor.

8           THE COURT:  So she had been a prostitute, and

9  he had paid for her services before they met, and she

10 saw the images on his computer?

11          THE WITNESS:  Yes, Your Honor.  She advised

12 that she met Mr. Haas for the first time approximately

13 four years ago, and that Mr. Haas back then approached

14 her and talked to her about wanting to have sexual

15 encounters with younger females.

16 Q   But the CW did not report that alleged statement

17 to law enforcement, correct?

18 A   She did not.

19          THE COURT:  Wait just a minute.  I thought he

20 just said she told him.

21          MS. ROBERTS:  No.  She told him in 2016.

22          THE COURT:  That's not the issue.  You said

23 "she never."  Never is a forever period of time with

24 no date on it.  And he just now said that she reported

25 this to him.  He's a law enforcement officer.  So is

1    your question that before, to his knowledge, did she

2    ever tell the police officers at or about the time of

3    the conversation in 2012 or so?  Is that your

4    question?

5              MS. ROBERTS:  Your Honor, whether prior to

6    telling him in 2016 whether she had provided that

7    information to law enforcement previously.

8              THE COURT:  All right.  Did she tell you

9    whether she had or not?

10             THE WITNESS:  She denied mention of any

11   information.  I am not aware if she provided the

12   information to another law enforcement agency but not

13   to myself.

14   BY MS. ROBERTS:

15   Q    And in fact for four years --

16             THE COURT:  What did she say that the

17   defendant said?  What did the CW tell you that the

18   defendant had told her in the conversation four years

19   before?  What was it he said?

20             THE WITNESS:  CW stated that Mr. Haas after

21   they had sexual encounters, she explained the type of

22   sexual encounters that Mr. Haas was interested in, and

23   that Mr. Haas advised her that he wanted or he was

24   interested in having sexual encounters with younger

25   females.  She understood that he was referring to

1   underage --

2           MS. ROBERTS:  Objection, Your Honor.  I would

3   object to what she understood.

4           THE WITNESS:  That's what she stated.

5           THE COURT:  She said she understood?

6           THE WITNESS:  That's not what I understood.

7   That's what she understood.  That's what she advised

8   me.

9           THE COURT:  Overruled.

10          She said she understood that to mean what?

11          THE WITNESS:  To mean underage females.  But

12  it wasn't until her meeting with him in 2016 that she

13  actually observed the child pornography images.  And

14  that was the fact -- that was what prompted her to

15  approach law enforcement because she realized that Mr.

16  Haas was serious about it.  You see, a lot of these --

17          MS. ROBERTS:  Objection, Your Honor.

18  Objection at this point.  It's not responsive.  The

19  agent is testifying and going on.

20          THE WITNESS:  I'm stating what she said.

21          THE COURT:  You asked about the conversation.

22  He's saying what she said in it.

23          MS. ROBERTS:  Your Honor, I asked a specific

24  question which was whether or not she had reported the

25  alleged conduct.

1          THE COURT:  I heard the question.  He's just

2    answering the question.  But I think we've gone far

3    enough.  The prosecutor can develop it if she wants

4    to.

5          When you open the door, the horse can come

6    in, you know, when there's no rules of evidence.

7          All right.

8    BY MS. ROBERTS:

9    Q    Agent Gonzalez, to be clear, between 2012 until

10   May of 2016, CW advised that she had had no contact

11   with Mr. Haas, correct?

12   A    She did not provide specific dates.  She said she

13   knew Mr. Haas from approximately four years.  That it

14   had been a long time since she had not met him, and

15   she recontacted or remet him in May 2016.  I don't

16   know the specific dates.  I don't know if they --

17   maybe they didn't meet for a year or two.  I do not

18   know.  She did not provide that information.

19          THE COURT:  Anything else?

20          MS. ROBERTS:  Yes, Your Honor.

21   BY MS. ROBERTS:

22   Q    Agent Gonzalez --

23          THE COURT:  Your purpose here is the

24   reliability of the informant.  You're getting far

25   afield now.  I really want it confined to that.

1          MS. ROBERTS:  Your Honor, I think the

2    CW's engagement --

3          THE COURT:  I just want it confined to that.

4          MS. ROBERTS:  Yes, Your Honor.  My

5    question --

6          THE COURT:  Just do it.  Do it.  I don't need

7    to hear it and then hear you do it.  Just do it.

8    BY MS. ROBERTS:

9    Q    Agent Gonzalez, I'm going to hand you a report, a

10   302, dated September 22nd of 2016.  And this report

11   alleges that you were present for an interview of CW

12   on June 16th of 2016.

13   A    Yes.

14   Q    Is that correct?

15   A    Yes.

16   Q    Were you in fact present for the interview with CW

17   on June 16, 2016?

18   A    I was present, yes.

19   Q    And have you had an opportunity to review this

20   report, which was authored by John Holberg, one of

21   your FBI associates?

22   A    I have seen this report before, yes.

23   Q    Does this report accurately reflect the

24   information that CW provided to you and Agent Holberg

25   and others during that interview?

GONZALEZ - DIRECT                44

1   A    I'm pretty sure it did, yes.  Or it does.

2   Q    According to this report, CW advised you that

3   after Mr. Haas -- I'm sorry.  One moment.

4              MS. ROBERTS:  I'm sorry, Your Honor.  I'm

5   trying to find the exact location in the report.

6   BY MS. ROBERTS:

7   Q    In the report, it notes that Mr. Haas first --

8              THE COURT:  Just ask him a question.  If you

9   are going to need to impeach him, then you can do it,

10  but we don't need to read through the report.  Just

11  ask him the question.

12  BY MS. ROBERTS:

13  Q    During the interview, CW advised you and others

14  that she had lost contact with Mr. Haas four years

15  ago, correct?

16  A    That is correct.

17  Q    And so between 2012, the earlier contact between

18  the two, between 2012 and May of 2016, CW had not had

19  contact in those four years with Mr. Haas, correct?

20  A    She did not provide that information, so I would

21  guess not.

22             THE COURT:  All right.  You've just wasted a

23  whole bunch of time over nothing.  Basically, he said

24  from the beginning that she said that she hadn't seen

25  him for about four years, and they got back together

1  in May of 2016.  You can argue from that that they

2  hadn't seen each other in four years.  Come on.  I

3  don't think it's disputed.  Let's go on.

4  BY MS. ROBERTS:

5  Q   With regards to --

6          THE COURT:  Not now.  You just simply haven't

7  gotten anything out of that line of questioning that

8  dealt with the reliability of the informant.  If your

9  next line of questioning doesn't deal with the

10 reliability of the informant, which is what you told

11 me you were putting him on for, then we're going to

12 stop the examination, let the government have their

13 cross, and then go on.

14         MS. ROBERTS:  Yes, Your Honor.

15         THE COURT:  Confine it to what we're doing.

16 BY MS. ROBERTS:

17 Q   With regards to the information about the laptop

18 that the CW said she observed in 2016, did she provide

19 you with any details regarding the laptop's

20 appearance?

21 A   She said it was a black laptop.

22 Q   She said it was a black laptop?

23 A   She said a black laptop.

24 Q   Agent Gonzalez, you did not include the

25 description in the affidavit or the information in the

1  affidavit that the CW said it was a black laptop,

2  correct?

3  A    I would have to review the affidavit.

4         THE COURT:  Well, it's either there or it

5  isn't.

6  BY MS. ROBERTS:

7  Q    And she didn't identify the brand or manufacturer

8  of the laptop?  For example, she didn't say it was a

9  Dell or a Toshiba or a Vaio, correct?

10 A    No.

11 Q    She didn't provide any specific identifying marks

12 or tell you anything specifically about the laptop

13 other than what you now say she told you, which was

14 that it was a black laptop, correct?

15 A    That's correct, yes.  She described the images

16 that were on the laptop.  That's what we were --

17        THE COURT:  She's just asking about what she

18 said about the laptop itself and what the description

19 was.

20        Anything else?

21 BY MS. ROBERTS:

22 Q    Agent Gonzalez, the phone call, the recorded phone

23 calls which you reference in your August 31 and

24 September 1, 2016 search warrant affidavits, did you

25 listen to each of those phone calls prior to your

1  swearing out the affidavit?

2  A    Many times.

3          MS. ROBERTS:  Your Honor, those are all of

4  the questions with regards to the reliability -- I'm

5  sorry.  One moment.

6          Your Honor, those are all the questions that

7  I have with regards to the reliability of the

8  confidential informant.  I do have questions for the

9  agent to clarify the details of the recovery of the

10 computer?

11         THE COURT:  She's not a confidential

12 informant.  She's a confidential witness.

13         MS. ROBERTS:  Confidential witness.  Your

14 Honor, I do have a line of questioning with regards to

15 the laptops that were recovered on September 1st.

16         THE COURT:  How many were recovered on

17 September 1st?

18         MS. ROBERTS:  Three, Your Honor.

19         THE COURT:  So what?  You haven't developed

20 anything in your papers about that at all.  We're not

21 giving you a rehearsal for trial or discovery.

22         MS. ROBERTS:  No, Your Honor.

23         THE COURT:  You didn't raise anything about

24 any of the disparity between laptops or a different

25 laptop or make any point of them that I know of.

1   Maybe I misread it.

2           MS. ROBERTS:  Your Honor, it goes to

3   omissions by the affiant, Agent Gonzalez, with regards

4   to the affidavit that was sworn out on September 1st

5   for the third laptop that was recovered, which is the

6   search warrant that we are contesting here.

7           I'll tell the Court that --

8           THE COURT:  What are you trying to prove?

9   That he didn't mention three laptops or what?

10          MS. ROBERTS:  Your Honor, that at the time

11  that they had -- they first obtained the warrant for

12  Mr. Haas's home and personal vehicle, they executed

13  the warrant and they recovered two laptop computers

14  from the home.

15          THE COURT:  Oh, they did?

16          MS. ROBERTS:  Yes, Your Honor.  They then

17  went to Mr. Haas's work site and arrested him.  At the

18  time that they arrested him at the work site, agents

19  indicate that he was inside of his vehicle and that

20  when they removed him they saw another laptop.

21          THE COURT:  All right.

22          MS. ROBERTS:  The affidavit for the search

23  warrant relating to the 1995 tractor-trailer and the

24  laptop on which these images were allegedly found

25  failed to include information or to state that the

1    agents had already issued or executed the warrant at

2    the home and recovered two laptops, which makes it

3    more likely or less likely --

4              THE COURT:  It looks to me like all that does

5    is help the government.  How does it help you?

6              MS. ROBERTS:  No, Your Honor, because it is

7    therefore less likely that a laptop found inside of a

8    work vehicle is the personal laptop that the agents --

9    that the CW referenced having seen at the home.

10             THE COURT:  She didn't describe it as a

11   personal laptop.  She described it as a laptop.  The

12   warrant says they can search for any laptops.  It

13   doesn't say one, two, three or four.

14             MS. ROBERTS:  Right, but that's the problem

15   with the second --

16             THE COURT:  No, it isn't.  It's not a

17   problem.  Just ask the simple question:  Had they

18   seized two previously?  Just go on and get it done so

19   I can have this over with.

20             We are treading in areas that just -- you

21   don't raise this in your papers.  There's no point to

22   it that I can tell.  And you're using this as

23   discovery.  I don't want to spend time with giving you

24   a deposition.

25             MS. ROBERTS:  Your Honor --

GONZALEZ - DIRECT                    50

1          THE COURT:  Now, ask the question and get it

2    done, please.

3    BY MS. ROBERTS:

4    Q   Were you present during the recovery of two

5    laptops from Mr. Haas's home?

6    A   I went to Mr. Haas's home.

7          THE COURT:  I think yes or no.  Were you

8    present when those were recovered?

9          THE WITNESS:  I was not the seizing agent.

10         THE COURT:  That isn't the question.  The

11   question was:  Were you present when they were seized?

12         THE WITNESS:  I have to say I was present at

13   the home.  I can't confirm that I saw the laptops

14   because there were many people conducting the search,

15   and I was focused on attempting to locate Mr. Haas.

16         THE COURT:  At the time that you filled out

17   the warrant for -- by the time you filled out the

18   warrant on September the 1st, did you know that two

19   laptops had been seized from the home even though you

20   didn't see them at the home?

21         THE WITNESS:  Probably, yes.  Yes.  I would

22   say yes.

23         THE COURT:  All right, now.  Anything else?

24         MS. ROBERTS:  Your Honor --

25   BY MS. ROBERTS:

GONZALEZ - DIRECT                    51

1   Q    And as a result of --

2            MS. ROBERTS:  Your Honor, at this time I

3   would seek to move into evidence first the search

4   warrant affidavit, I'm sorry, the search warrant

5   return from the September 1st, 2016 search of Mr.

6   Haas's home.

7            THE COURT:  Any objection?

8            MS. MANSFIELD:  Your Honor, off the top of my

9   head I don't know the date that that was returned.  I

10  don't think it has in any relevance.  I don't object

11  to it being introduced.

12           THE COURT:  It's the return of the search

13  executed on the 1st; is that right?

14           MS. ROBERTS:  Yes, Your Honor.

15           THE COURT:  Of the home.

16           MS. ROBERTS:  Of the home, yes, Your Honor.

17           THE COURT:  What's the number?  Defendant's

18  Exhibit what?

19           MS. ROBERTS:  Your Honor, we're labeling this

20  Defendant's Exhibit B.

21           THE COURT:  No, you've already got a B.

22           MS. ROBERTS:  We'll change that and make that

23  Defendant's Exhibit C, Your Honor.

24           THE COURT:  It is admitted without objection.

25           (Defendant's Exhibit C is admitted into

1   evidence.)

2           THE COURT:  Anything else?

3           MS. ROBERTS:  Your Honor, we move to enter,

4   if it hasn't already been entered, the search and

5   seizure warrant and affidavit related to the 1995 Ford

6   tractor.

7           THE COURT:  Was that A or B?  I'm not going

8   to make any rulings in a vacuum.  Just tell me was it

9   A or B.  If it's A and B, they've already been

10  admitted.

11          MS. ROBERTS:  We'll call that B, Your Honor.

12          THE COURT:  B has or has not been admitted?

13          MS. ROBERTS:  There was a stipulation.  I

14  didn't hand it up to the Court, though.

15          THE COURT:  All right.  So what is B?

16          MS. ROBERTS:  B is the search warrant.

17          THE COURT:  Which one?

18          MS. ROBERTS:  For the tractor-trailer,

19  September 1st, 2016.

20          THE COURT:  No objection to that?

21          MS. MANSFIELD:  No, Your Honor, no objection.

22          THE COURT:  All right, it's admitted.

23          (Defendant's Exhibit B previously admitted

24  into evidence on page 5.)

25          MS. ROBERTS:  Your Honor, we would next move

1   to admit into evidence Defendant's Exhibit D pursuant

2   to the stipulation.  This is an accurate transcript of

3   the telephone calls between Mr. Haas and CW on

4   August 14th of 2016.

5           THE COURT:  Any objection?

6           MS. MANSFIELD:  No, Your Honor, no objection.

7           THE COURT:  It's admitted.

8           (Defendant's Exhibit D is admitted into

9   evidence.)

10          MS. ROBERTS:  In addition to that, Your

11  Honor, we would move as Defendant's Exhibit E the

12  transcript of the call between Mr. Haas and CW 1 on

13  August 16th of 2016.

14          THE COURT:  CW 1?

15          MS. ROBERTS:  I'm sorry.  The exhibit says CW

16  1, but we'll just say CW.  I'm sorry.  I was reading

17  from the exhibit.

18          THE COURT:  On what date?

19          MS. ROBERTS:  On August 16th, 2016.

20          THE COURT:  All right.  Any objection?

21          MS. MANSFIELD:  No, Your Honor, no objection.

22          THE COURT:  It's admitted.

23          (Defendant's Exhibit E is admitted into

24  evidence.)

25          MS. ROBERTS:  One moment.

GONZALEZ - DIRECT                    54

1          THE COURT:  How about the first search

2     warrant, Exhibit A, are you offering that?

3          MS. ROBERTS:  Your Honor, we are moving to

4     enter Exhibit A, the search warrant of the home, and

5     I'll provide the Court with a copy of that in just a

6     few moments.

7          THE COURT:  All right.  Anything else?

8     Anything else?

9          MS. ROBERTS:  One moment, Your Honor.

10          Your Honor, finally, I would enter into

11     evidence the stipulation of the parties.  And we're

12     just looking for --

13          THE COURT:  What exhibit numbers?

14          MS. ROBERTS:  This should be Defendant's

15     Exhibit F, Your Honor.

16          THE COURT:  Any objection?

17          MS. MANSFIELD:  No, Your Honor.  The

18     government entered into the stipulations.

19          THE COURT:  All right.

20          (Defendant's Exhibit F is admitted into

21     evidence.)

22          THE COURT:  Anything else?

23          MS. ROBERTS:  No, Your Honor.  No further

24     questions of the witness and no further evidence.

25          THE COURT:  As I understand it, you are not

GONZALEZ - CROSS                    55

1  challenging the search warrant of the home, Exhibit A.

2  You're challenging the search warrant of the

3  tractor-trailer, Exhibit B.

4          MS. ROBERTS:  That's correct, Your Honor.

5          THE COURT:  All right.

6

7      CROSS-EXAMINATION

8  BY MS. MANSFIELD:

9  Q   Agent Gonzalez, I just want to ask you a few

10  questions about the steps you took to corroborate the

11  statements that CW made to you.  When you initially

12  met with the CW in June of 2016, did she provide you

13  the name of Mr. Haas?

14  A   She provided the name "Todd."  That's all she knew

15  at that time.

16  Q   Did she provide you with the phone number for him

17  (804)402-6003?

18  A   That is correct.

19  Q   Did you then run a search of law enforcement

20  databases to determine that that number was linked as

21  a contact number for Mr. Haas?

22  A   Yes, we did.

23  Q   And at that time -- and did you also then once you

24  had that information show a photo of Mr. Haas to the

25  witness for her to identify?

1    A    Yes, we did.

2    Q    And did she additionally provide you with -- did

3    you additionally show her a photo of the residence

4    that you connected to Mr. Haas at 661 Green Castle

5    Road?

6    A    Yes, we did.

7    Q    And did the witness identify that as being the

8    residence that she had visited?

9    A    Yes, she did.

10   Q    And that was a residence that you determined was

11   connected to Mr. Haas through a search of law

12   enforcement databases?

13   A    It was previously owned by him.

14   Q    And then, ultimately, as outlined in your search

15   warrant, when you met with the witness again in July,

16   would she have had additional conversations with Mr.

17   Haas about the production of child pornography or she

18   stated to you that she had had additional

19   conversations with Mr. Haas about the production of

20   child pornography, correct?

21   A    She did, yes.

22   Q    So then in August did you provide her with a

23   recording device to attempt to capture those

24   conversations in order to confirm and corroborate what

25   the witness was telling you?

1    A    That is correct.

2         MS. MANSFIELD:   One moment, Your Honor.   I

3    apologize.

4    BY MS. MANSFIELD:

5    Q    Did this witness indicate to you that Mr. Haas had

6    suggested to her during their conversations that he

7    had access to children or children in the

8    neighborhood?

9    A    Yes, she did.   It was, according to the

10   information provided by the CW, Mr. Haas had access to

11   a 12-year-old.

12   Q    And then a few days after those recorded phone

13   calls in August, it looks like August 18th, did you

14   indeed receive a report from the Richmond Police

15   Department that indicated that Mr. Haas was a subject

16   in a child molestation allegation?

17   A    That is correct.

18   Q    And at that time did you understand that

19   information to be further corroboration of what CW had

20   indicated to you was the substance of CW's

21   conversations with Mr. Haas?

22   A    It was a clear indication that he was in fact

23   looking forward to producing child pornography.

24   Q    Did you also then do a telephone analysis of Mr.

25   Haas's phone and connect that phone number to the

1   Richmond Inn, which was detailed in that child

2   molestation allegation?

3   A    The Richmond Inn and also the child's mother,

4   biological mother.

5   Q    Agent Gonzalez, I just want to be clear.  The

6   steps that you took after meting with the witness in

7   June and July, this was your effort to corroborate the

8   information that that witness had told you?

9   A    Yes, of course.

10             MS. MANSFIELD:  No questions, Your Honor, for

11   this witness.

12

13        REDIRECT EXAMINATION

14   BY MS. ROBERTS:

15   Q    Agent Gonzalez, with regards to the Chesterfield

16   information regarding -- the information regarding the

17   alleged conduct in Chesterfield, the alleged victim in

18   that incident did not allege that Mr. Haas took

19   pictures, correct?

20   A    No.  When he sexually molested her, it included

21   fondling her vagina --

22   Q    So the answer is no, he did not?

23   A    No production of child pornography.

24   Q    And the alleged victim in Chesterfield did not

25   indicate the use or presence of a laptop computer or

GONZALEZ - REDIRECT                    59

1  computer at all by Mr. Haas; is that correct?

2  A    She did not disclose it.

3  Q    The alleged victim in Chesterfield did not allege

4  that the encounter with Mr. Haas involved a GPS

5  device, correct?

6  A    Can you repeat the question?

7  Q    She did not allege the use or presence by Mr. Haas

8  of a GPS device during the encounter that allegedly

9  took place?

10  A    The child?

11  Q    The child.

12  A    No.

13           THE COURT:  You keep saying the Chesterfield

14  victim.  What date is this?

15           MS. ROBERTS:  Your Honor, this is --

16           THE WITNESS:  It's -- I'm sorry, Your Honor.

17           THE COURT:  Is this 8-18-16?

18           THE WITNESS:  Yes, Your Honor.

19           THE COURT:  So that report came from the

20  Chesterfield Police Department?

21           THE WITNESS:  Yes, Your Honor, and it was

22  referred to Chesterfield by Richmond P.D.  We received

23  a copy of the Chesterfield and Richmond P.D. reports,

24  their investigative reports, and a forensic interview

25  that was conducted on the child.

1      THE COURT:  All right.

2  BY MS. ROBERTS:

3  Q    The alleged victim in the Chesterfield incident,

4  she was not able or she did not identify Mr. Haas by

5  photo or name, correct?

6  A    She provided the name "Todd."  She did not

7  identify the photo that was displayed, which to my

8  knowledge it was a very old photo of Mr. Haas.

9  Q    So she was shown a photo and she failed to

10  identify that photo as the person who allegedly

11  sexually assaulted her, correct?

12  A    I was not present, but I was told that, yes.  And

13  that is included in the affidavit.

14      MS. ROBERTS:  One moment.

15  BY MS. ROBERTS:

16  Q    With regard to the Chesterfield charges, those

17  charges were nol prossed, correct?

18  A    I believe they were nol prossed after we federally

19  indicted him.

20  Q    Those charges were nol prossed prior to execution

21  of the search warrant; is that correct?

22  A    No.

23  Q    Subsequent to the search warrant?

24  A    After.

25  Q    Yes.

1       MS. ROBERTS:  Your Honor, at this time I have

2   no further questions for the witness, but I would, as

3   a housekeeping matter, seek to introduce Defendant's

4   Exhibit G.  I failed to introduce that earlier, and

5   these are the text messages between the CW and Mr.

6   Haas that I questioned Agent Gonzalez and he testified

7   --

8       THE COURT:  Any objection?

9       MS. MANSFIELD:  No objection, Your Honor.

10      THE COURT:  They're admitted without

11  objection.

12      (Defendant's Exhibit G is admitted into

13  evidence.)

14      MS. ROBERTS:  No further questions.

15      THE COURT:  Do you have anything?

16      MS. MANSFIELD:  No, Your Honor.

17      THE COURT:  Is that it?

18      MS. ROBERTS:  Yes, Your Honor.

19      THE COURT:  Is there any particular reason --

20  would you have a seat, please, Agent Gonzalez.

21      Why didn't you put in the affidavit that the

22  confidential informant had reported giving false

23  information to police officers in Henrico County in

24  July of 2016?

25      THE WITNESS:  Why was it not included?

1        THE COURT:  Yes, why wasn't that included in

2   the affidavit?

3        THE WITNESS:  I truly didn't think it was

4   relevant at that time.  We had corroborated all the

5   information that she had provided, and she wasn't a --

6   she wasn't an open confidential informant for the FBI;

7   just a witness.  So we -- the process for -- to handle

8   confidential informants and witnesses is very

9   different.

10        THE COURT:  How is it different?

11        THE WITNESS:  Confidential informants, we

12   open in our computer database, and we perform criminal

13   record checks.  We have to seek permission from or

14   consult to get concurrence from an AUSA's office in

15   order to engage in consensual recordings or any type

16   of otherwise illegal activities.

17        THE COURT:  Let me get this straight.  If I

18   report something to the FBI, and it obviously in the

19   view of the FBI is a crime, are you saying that as a

20   witness, you would not do a criminal background check

21   on me?

22        THE WITNESS:  If you're a witness?

23        THE COURT:  Just a witness.  I'm a guy who

24   picks up the phone and says, I saw a robbery downtown

25   here, and here's my name, and this is the date, and

1   this is what I saw.  Would you do a criminal

2   background check on me?

3              THE WITNESS:  If I'm going to meet with you

4   in person for the first time and I don't know who you

5   are, yes, sir, I would run a criminal record.  We did

6   not with our CW because she was referred to us by

7   another field office, and they had previously used her

8   in their investigations.

9              THE COURT:  So CW came to you -- let me get

10  this straight.  Did CW first report to the Norfolk

11  Field Office the viewing of child pornography on the

12  defendant's computer in May of 2016?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  And then that was relayed to you

15  because he lived in this area and this was your area;

16  is that right?

17             THE WITNESS:  It was forwarded to one of our

18  TFOs, Holberg, because we're all part of the Child

19  Exploitation Team, and I got involved in the

20  investigation.

21             THE COURT:  Why you as opposed to the Norfolk

22  Field Office?

23             THE WITNESS:  Because it's in our territory.

24             THE COURT:  Geographic territory or subject

25  matter territory?

1          THE WITNESS:  The subject was in our area of

2    responsibility in Chesterfield.

3          THE COURT:  All right.  Subject meaning who?

4          THE WITNESS:  Mr. Haas.

5          THE COURT:  All right.  Anybody have any

6    questions based on what I asked?

7          MS. MANSFIELD:  No, Your Honor.

8          THE COURT:  I do have another question.

9          By the time that you issued the search

10   warrant on September 1st on the tractor-trailer, had

11   anybody viewed the computers seized in the defendant's

12   home earlier that day?

13         THE WITNESS:  I'm pretty sure that we were in

14   the process of reviewing.

15         THE COURT:  But did you know what the review

16   showed?

17         THE WITNESS:  No, no.  No, Your Honor.

18         THE COURT:  All right.  All right.  Thank

19   you.

20         Can he be excused?

21         MS. ROBERTS:  Yes, Your Honor.

22         MS. MANSFIELD:  That's fine.

23         THE COURT:  All right.  You can step down.

24         THE WITNESS:  Thank you, Your Honor.

25         (The witness was excused from the witness

1    stand.)

2              THE COURT:  Do you all have argument?

3              MS. ROBERTS:  Your Honor, I do have argument;

4    however, I would ask the Court to consider granting a

5    brief recess.  I'd like to have time to use the

6    bathroom, and also to regroup given the Court's ruling

7    on the *Franks* issue.  I just need to cut the fat from

8    my argument and go straight to the issues that are

9    before the Court today.

10             THE COURT:  We will resume this hearing at

11   three o'clock.  I'll hear everything you've got to say

12   at that time.  And if you wish to argue that the

13   *Franks* hearing should be held, I don't know what you

14   would do other than what you've already done.  You

15   said you were using this for the good faith exception

16   argued by the government.  I'll hear something on how

17   you think you've met the first test for *Franks*, but I

18   don't think you have.

19             MS. ROBERTS:  Thank you, Your Honor.

20             THE COURT:  All right.  I urge you to use

21   that time to cut out the -- what did you call it?

22   Lard, fat?  Whatever you called it.  That would be

23   good.

24             MS. ROBERTS:  Yes, Your Honor.

25             THE COURT:  All right.  And the other

1  thing -- well, I'll talk to you later.  Thank you.

2  We'll be in recess.  I'll see you at three o'clock.

3           (Recess taken from 11:35 a.m. to 3:00 p.m.)

4           THE COURT:  All right.  It's your motion.

5           MS. ROBERTS:  Yes, Your Honor.  Thank you.

6           Your Honor, first, before I get started, I

7  would like to point out with regards to Defendant's

8  Exhibit F, which is the stipulations entered in this

9  case --

10          THE COURT:  Uh-huh.

11          MS. ROBERTS:  -- we did not fill that out at

12 the conclusion of the evidence once all of the

13 exhibits had been re-ordered.  And so at this time I

14 would seek to actually insert exhibit identifiers in

15 each of the paragraphs.

16          Paragraph one said the parties stipulate and

17 agree that Defense Exhibit, and it's left blank, is a

18 true and accurate copy.

19          THE COURT:  I can do that.  I just didn't

20 understand what you were saying.

21          MS. ROBERTS:  Yes, Your Honor.  So paragraph

22 one should be, as referenced, Exhibit B.

23          THE COURT:  Uh-huh.

24          MS. ROBERTS:  Paragraph two, Exhibit A.

25          THE COURT:  Uh-huh.

1      MS. ROBERTS:  Three is Exhibit D.

2      THE COURT:  D as in dog?

3      MS. ROBERTS:  D as in dog.  Four, Exhibit E.

4      THE COURT:  All right.

5      MS. ROBERTS:  Your Honor, moving on to the

6  arguments here, we are challenging the search warrant

7  issued on September 1, 2016, for the search of the

8  1995 Ford tractor-trailer, and the seizure of a

9  Samsung Galaxy S5 phone, laptop computer, and GPS

10 device.

11     We gladly accept the Court's invitation to

12 argue how we've met our burden with regards to the

13 first prong of *Franks v. Delaware*.  Through the

14 testimony and evidence presented here today, the

15 defendant has made a prima facie showing that the

16 warrant contained --

17     THE COURT:  Sorry.  I've exhausted my papers

18 up here, whatever.  All right.

19     MS. ROBERTS:  Through testimony and evidence

20 we've demonstrated a prima facie showing that the

21 warrant contained both material omissions and

22 intentional misrepresentations by the affiant.

23     THE COURT:  What are the material omissions?

24     MS. ROBERTS:  With regards to the material

25 omissions, I've identified three for the Court.  First

1   is the omission by the affiant regarding the lack of

2   voracity and unreliability of CW.  And that was --

3          THE COURT:  That's not even a basis for

4   anything.  That's your conclusion.  What's got to be

5   left out is a fact.  If the witness -- if the affiant

6   did not believe that the woman lacked voracity, he had

7   no obligation to put that in there.

8          MS. ROBERTS:  Your Honor --

9          THE COURT:  So you have to point to some

10  objective fact that was left out.  You can't argue

11  conclusions like that.

12         MS. ROBERTS:  Yes, Your Honor.

13         THE COURT:  So that ground is nonexistent.

14         MS. ROBERTS:  So with regards to an omission

15  with regards to the voracity, no information in the

16  warrant with regards to the voracity and reliability

17  of the CW.  Through testimony today --

18         THE COURT:  Now, wait just a minute.  There's

19  all kinds of information about corroboration.  So that

20  has to do with voracity.  Why don't you say what you

21  mean?  You mean to say --

22         MS. ROBERTS:  She's a convicted felon.

23         THE COURT:  He did not put in there X.

24  That's what you mean, right?  Don't make these big,

25  broad statements.  He did not put in there what?

1    MS. ROBERTS:  Your Honor, Agent Gonzalez

2    failed to include in the affidavit that CW was a

3    felon; that CW was currently on probation; that CW had

4    pending charges; that he had knowledge that CW

5    continued to violate the law even while working with

6    him and other agents in the instant matter.

7    THE COURT:  We don't have anything like that

8    in the record.  You want to tell me what you mean?

9    MS. ROBERTS:  Yes, Your Honor.

10   THE COURT:  That's a generalized conclusion

11   and you can't say those things.  You have to be

12   specific.

13   MS. ROBERTS:  Agent Gonzalez was aware that

14   there were felony warrants issued for CW as a result

15   of the forged summons that she tendered in Henrico

16   County in July of 2016.  That is a fact that he was

17   aware of prior to his issuing or swearing out the

18   affidavit for the instant warrant.

19   He was also aware that CW had provided false

20   statements, orally provided false statements to law

21   enforcement.  That is another fact that was known to

22   him on August 31st that he failed to include in the

23   affidavit provided to the magistrate.

24   THE COURT:  Okay.  Those are the material

25   omissions; is that right?

1      MS. ROBERTS:  There are more.

2      THE COURT:  Please make sure -- have you ever

3  heard the old adage, "If you're going to touch the

4  king, kill him"?  Have you heard that?  Do you know

5  what that means?  If you're going to assert a point,

6  make sure it's got some merit to it.  Don't make a

7  laundry list of everything you can conceivably think

8  of that somebody testified to that conceivably might

9  just in another atmosphere have some purpose.

10      MS. ROBERTS:  Your Honor --

11      THE COURT:  And you are repeating the same

12  things.

13      MS. ROBERTS:  Your Honor, he was aware --

14  Agent Gonzalez was aware that CW continued to engage

15  in prostitution, and he was aware of that at the time

16  that he swore out the affidavit.

17      THE COURT:  What do you mean engage in

18  prostitution?  When?  What testimony that he gave

19  showed that between the time that she talked to him in

20  May of 2016 and August 31, 2016, that he knew she was

21  engaging in prostitution during that time?  She may

22  have, and it may very well be a reasonable inference,

23  but I don't remember any testimony where you asked

24  that or he said that.  Do you see what I'm saying?

25      MS. ROBERTS:  Your Honor, with regards to

1   that, I was referencing the two reports, but the Court

2   is correct that Your Honor did not allow the

3   introduction of the agent's report, which would have

4   contained that information.  So I'll withdraw --

5         THE COURT:  Anything else that are material

6   omissions?

7         MS. ROBERTS:  Yes, Your Honor.  The second

8   material omission --

9         THE COURT:  No, that's not the second one.

10   You have one, two, three, four, five so far.

11         MS. ROBERTS:  I'm sorry, Your Honor.  I

12   grouped them all with regards to CW's credibility and

13   reliability.

14         THE COURT:  All right.  So this has to do

15   with omissions regarding credibility?

16         MS. ROBERTS:  Yes.

17         THE COURT:  I understand what you're saying.

18   That's what this whole thing was about, this hearing

19   was about, was the reliability of CW.  And I thought

20   all these things related to --

21         MS. ROBERTS:  All of those things do relate

22   to CW's credibility.

23         THE COURT:  All right.

24         MS. ROBERTS:  In addition to omissions

25   regarding CW's credibility, if the Court -- I direct

1    the Court's attention to the August 16th phone call,

2    which has been previously marked as Defense Exhibit, I

3    believe, E.

4            THE COURT:  Is that the ones referred to in

5    the briefs?

6            MS. ROBERTS:  They are both referenced in the

7    brief, Your Honor, but Defendant's Exhibit E is the

8    one most heavily relied upon or referenced.

9            THE COURT:  This is a material omission?

10           MS. ROBERTS:  This is a material omission,

11   Your Honor.  I would direct the Court's --

12           THE COURT:  Excuse me.  It is a material

13   omission relating to what?

14           MS. ROBERTS:  The affiant, Agent Gonzalez,

15   failed to include Mr. Haas's --

16           THE COURT:  No.  Relating to what large

17   topic?  Like reliability.  Have you shifted from

18   credibility and reliability to some other topic?  You

19   told me you have three topics.  I don't know what

20   topic we're on now.

21           MS. ROBERTS:  This goes to the issue of

22   probable cause itself and the likelihood --

23           THE COURT:  But that's not a material

24   omission.

25           MS. ROBERTS:  Your Honor, if I can tell the

1   Court what the statement is that was --

2         THE COURT:  I want you to tell me where it

3   fits so I can put it where it fits and get this

4   organized.  See what happens here is, what this whole

5   thing consists of is a bunch of stuff, isolated things

6   strewn out onto the stage and leaving it to the Court

7   to try to put them somewhere so you figure out what it

8   is that in the test that you have to apply, what

9   evidence applies to what.  And I'm trying to organize

10  that now so I understand your points.

11        So you have five material omissions that you

12  say relate to CW's credibility.  You're now shifting

13  to material omissions relating to something else you

14  said.  So what does it relate to?

15        MS. ROBERTS:  The truthfulness of the

16  statements in the affidavit as presented by the agent.

17        THE COURT:  So this has to do with the -- not

18  with a material omission.  It has to do with whether

19  or not the agent's statement in the affidavit is true

20  or not, right?

21        MS. ROBERTS:  It is --

22        THE COURT:  Yes or no?

23        MS. ROBERTS:  It is not a statement that's

24  included.  It is a statement that is excluded that we

25  propose to the Court is material and has a direct

1   bearing on whether or not Mr. Haas in fact intended to

2   receive the items for himself or whether or not they

3   were for some other person.

4        THE COURT:   That's not how it works.   You are

5   attacking something here.   On the *Franks'* side, you

6   are attacking something.   What are you attacking?

7   You're saying that the agent omitted facts.   He

8   omitted facts relating to the credibility of CW.

9        Now you're shifting to something that attacks

10  the agent, right?   That is, he omitted something.

11  There is a fundamental principle at law that once you

12  start talking about something -- you have no

13  obligation to reveal certain things, for example, but

14  once you start talking, you have an obligation to say

15  all those things that make true what you're saying.

16  And so now you're saying, as I understand it, that the

17  agent failed to put in some things that were in this

18  Exhibit E that were necessary for him to have made a

19  true statement in the affidavit.   Is that what you're

20  saying?

21       MS. ROBERTS:   Yes.

22       THE COURT:   All right.   Where is the true

23  statement in the affidavit?

24       MS. ROBERTS:   Your Honor, I would direct the

25  Court's attention to page two.

1          THE COURT:  Of?

2          MS. ROBERTS:  Of Exhibit E, which is the

3   August 16 phone call.

4          THE COURT:  No.  Nope.  I'm sorry.  I want to

5   know what statement in the affidavit we are measuring

6   this statement in Exhibit E against.  That's all.

7          MS. ROBERTS:  Your Honor, there is no

8   statement in the affidavit, and that's why I'm

9   referring to it as an omission to include a statement

10  in the affidavit that has a bearing on the

11  determination of probable cause in this case.

12         THE COURT:  So you're not then saying that

13  the agent made a material misrepresentation?

14         MS. ROBERTS:  Your Honor, I call these

15  omissions.

16         THE COURT:  No.  Answer the question.

17         MS. ROBERTS:  Correct.

18         THE COURT:  You're not saying he made a

19  material misrepresentation?

20         MS. ROBERTS:  Correct.

21         THE COURT:  Okay.  So he made an omission

22  that has to do with what?

23         MS. ROBERTS:  The truthfulness of the

24  statements in the affidavit.

25         THE COURT:  That's misrepresentation.  If

1   you're testing somebody's truthful statement, then I

2   want to know what -- you're saying this omission that

3   you're going to point to in four relates to something

4   that was said in the affidavit that you say is lacking

5   in truthfulness.  So now I want to see, so I

6   understand what you're talking about, where it is in

7   the affidavit that is the statement you want me to

8   measure against what's in Exhibit E.  Where is that

9   statement?  Or is there none?

10              MS. ROBERTS:  There is no statement.

11              THE COURT:  Okay.  Well, then go ahead and

12  say it your way.  This is not how you presented it in

13  your papers.  It's not how you presented it in your

14  argument, but let's go.  All right.

15              So the transcript -- where is the transcript?

16  I've got it.  Which line do you want?  Which statement

17  do you want me to look at?

18              MS. ROBERTS:  Your Honor --

19              THE COURT:  Where is it?

20              MS. ROBERTS:  In the phone call, page two

21  of -- and it's page two.  It is three-fourths the way

22  down the page, and it starts, "CW says, 'What's the

23  range that you like?'"

24              THE COURT:  Wait a minute.  I haven't found

25  that yet.  Okay.

1        MS. ROBERTS:  Mr. Haas's response is, "It

2   ain't so much me as it is like other, but, you know,

3   around exactly like what you were saying before.  You

4   know, give or take a little bit.  You remember what

5   you were talking about before.  That is, that is like

6   the most."

7        Your Honor, it is our position that --

8        THE COURT:  Wait a minute.  You left out the

9   rest of it.  It says, "I remember I said I had a 12

10  and an 8," talking about the age of the children.

11       MS. ROBERTS:  Your Honor, that is an

12  assumption.

13       THE COURT:  That's not an assumption.  That

14  is a logical connection between what Haas said because

15  he refers back to "You remember what you were talking

16  about before."  She then says, This is what I was

17  talking about before.  She says to articulate that, "I

18  remember.  I said I had a 12 and an 8."  That

19  statement fits together as a piece.  You can't take

20  just part of it.  And then Haas says as if to make

21  that clear, Yeah, that's the lower side of that is

22  definitely better.  The lower side of eight to 12 is

23  definitely better.  In other words, I like them at

24  eight years old or eight to 10.  That's what the fair

25  reading of that statement is about.

1      MS. ROBERTS:  Even if the Court -- if we were

2  to proceed with the Court's conclusion --

3      THE COURT:  Then he goes on to say, "I mean,

4  there's definitely -- there's definitely money in

5  other, but, you know, I mean it's not as much as the

6  other."

7      MS. ROBERTS:  Again, Your Honor, she asked --

8  and what I'm asking the Court to focus on, the Court

9  has said that this is a conversation about 12 and

10  eight-year-olds.  Even assuming that it was a

11  conversation about 12 and eight-year-olds, she says,

12  "What's the range that you like?"  And Mr. Haas stops

13  her and corrects her and says that it is not me.  It

14  is others.

15      And so, Your Honor, the fact that Mr. Haas

16  includes that statement that it is not me as it is

17  like others, it reflects --

18      THE COURT:  What are you talking about?  You

19  mean what he likes personally in order to satisfy his

20  own personal proclivities while he's engaging in sex

21  with minors?  Or do you mean it's the market I'm

22  serving, and the film I need to make has to satisfy

23  these people, and these people want 12 to

24  eight-year-olds?  That's the way that statement reads

25  to me.  But you're saying, "It ain't so much me as it

1  is like other, but, you know, around like exactly what

2  you were saying before, you know, give or take a

3  little bit."  And this is almost an unintelligible

4  statement to begin with, but viewed in terms of the

5  question, what's the range that you like, like for

6  what?  Like to pleasure himself or like to film?

7  Isn't that what this is all about?

8          MS. ROBERTS:  Your Honor, if the Court --

9          THE COURT:  Or like to read, like to look at?

10  What?

11          MS. ROBERTS:  This entire telephone call is

12  only given context if you believe the information that

13  the CW provided in the unrecorded phone conversations

14  that she allegedly had with Mr. Haas.  The Court has

15  accepted, it seems by the comments here, that this

16  was -- that these were conversations about Mr. Haas's

17  desire to obtain, one, images of child pornography

18  and, two, to obtain an actual underage female for

19  purposes of a sexual encounter.

20          THE COURT:  What is the other inference you'd

21  have me make?

22          MS. ROBERTS:  Your Honor, we don't know what

23  they're talking about.  If the Court didn't have the

24  backdrop that they say -- that the government asserts

25  was provided by CW, if you don't have CW's explanation

1   of what this conversation is a continuation of or what

2   it's purported to be the subject matter of the

3   conversation, then what you have if you read this is

4   completely unintelligible, and it does not necessarily

5   reflect Mr. Haas's intention to seek nude photos or to

6   engage in sexual conduct with an underage female or

7   individual.

8           THE COURT:  Well, if it is informed by what

9   the affidavit says occurred in the unrecorded

10  conversations, then it's reasonable to infer that

11  they're talking about making films or viewing or

12  having sex with people in the range of 12 to eight.

13          MS. ROBERTS:  But the affidavit does not

14  contain information that provides a backdrop or

15  context except for what is provided by CW.  There's no

16  other information.

17          THE COURT:  Okay.  So I believe CW.  That

18  helps me give context to this if I am the magistrate

19  judge.  I believe what he's related about CW is all

20  right.  I understand.  All right.  I understand.

21          Move to a different topic, because I believe

22  this one doesn't fly very well.

23          MS. ROBERTS:  Your Honor, the third omission

24  is the affiant, Agent Gonzalez's, failure to include

25  in the search warrant affidavit.

1          THE COURT:  Which?

2          MS. ROBERTS:  This is Exhibit B.

3          THE COURT:  Uh-huh.

4          MS. ROBERTS:  The search warrant affidavit of

5  the 1995 truck.  I'd refer the Court to page 16,

6  paragraph 25 of Exhibit B.

7          THE COURT:  Paragraph 25?

8          MS. ROBERTS:  Paragraph 25, page 16,

9  paragraph 25.

10         THE COURT:  Uh-huh.

11         MS. ROBERTS:  Your Honor, what has occurred

12 factually before this is that --

13         THE COURT:  No.  Put me in the picture first.

14 Where?

15         MS. ROBERTS:  Paragraph 25.  Based on this

16 information, it starts the beginning of the paragraph,

17 the FBI obtained a search warrant for Haas's new

18 residence from this court on August 31st.  The FBI

19 executed the search warrant early on September 1st but

20 found that Haas had already left for work.

21         THE COURT:  Okay.

22         MS. ROBERTS:  It goes on to say that during

23 the search incident that he was arrested at a

24 different location, and during the search incident to

25 arrest agents recovered a Samsung Galaxy s5 model

1   number phone from Mr. Haas's person.

2          Also during a protective sweep of the

3   tractor-trailer truck, an FBI agent observed a GPS

4   device attached to the windshield as well as a laptop

5   bag which contained a laptop computer.

6          THE COURT:  So what did he not include in

7   that paragraph that you think he should have included?

8          MS. ROBERTS:  Your Honor, we believe it was

9   material that he include the fact that agents during

10  the execution of the first search warrant had in fact

11  seized two laptop computers from the defendant's home.

12         The fact that those two laptop computers had

13  been seized and that it was specifically the target of

14  the search of his home or specifically identified as

15  material that they were seeking in the search of his

16  home, it makes it less likely that the laptop observed

17  inside of a work vehicle was the one that CW allegedly

18  saw some three months prior.

19         In furtherance of that argument, there's no

20  evidence that the CP images stored or possessed or, I

21  should say, the affidavit contains no evidence that

22  the CP images stored or possessed in Mr. Haas's work

23  truck -- I'm sorry.  There's no evidence that there

24  were CP images stored or possessed in Mr. Haas's work

25  truck.  There's no allegation of that.

1          The CW certainly didn't mention his work

2    truck, nor did the 11-year-old complainant, who was

3    also referenced in the search warrant affidavit.

4          In fact, Your Honor --

5          THE COURT:  Anything else?

6          MS. ROBERTS:  I would point the Court to

7    Exhibit G, which is the text messages.

8          THE COURT:  Anything else about the

9    omissions?

10          MS. ROBERTS:  Yes, Your Honor.  This is with

11    regards to the omissions and the statement that

12    there's no evidence that he stored or possessed CP or

13    child pornography in the work truck.  The text

14    messages exhibit that we've provided to the Court on

15    page 3 of that exhibit.

16          THE COURT:  Are they numbered?

17          MS. ROBERTS:  They are not numbered, Your

18    Honor.  This is the way that they were provided in

19    discovery.

20          THE COURT:  It starts, the message, "Damn.

21    Better drive fast"?

22          MS. ROBERTS:  Yes, Your Honor.

23          THE COURT:  So what?

24          MS. ROBERTS:  Your Honor, there Mr. Haas

25    clearly states that he's driving.  He says, "Dude,

1    there's no way I can get there this evening and then

2    get back home.  Can I see you tomorrow night or are

3    you driving down here any this week?  P.S. Don't have

4    laptop."

5              THE COURT:  So what does that mean?

6              MS. ROBERTS:  Your Honor, this is evidence --

7    some evidence that Mr. Haas does not travel with a

8    laptop.  And that's contrary to what the government or

9    the affiant would have the magistrate to have believed

10   in asserting that the laptop -- that there was

11   probable cause to believe that the laptop found in the

12   work truck was related to the offense or to any

13   information that had been provided by the CW.  There's

14   no nexus between that work truck and any alleged

15   unlawful conduct by Mr. Haas.

16             Your Honor, I would next move to intentional

17   misrepresentations that I believe we have demonstrated

18   here today.  The affidavit contains at least two

19   material misstatements that directly bear on the

20   finding of probable cause.

21             If the Court looks to Exhibit B again, which

22   is the search warrant affidavit of the truck, page 12,

23   paragraph 11.

24             THE COURT:  All right.  Where?

25             MS. ROBERTS:  Your Honor, if the Court

1    proceeds down to four lines from the bottom of the

2    page, it is mid line, and it begins, "Haas also

3    requested nude photos of underage females in exchange

4    of money."  This paragraph -- I'm sorry.  If I could

5    back up.  The affiant indicates that on August 12,

6    2016, and August 13, 2016, CW recorded two telephone

7    calls with Haas.  And this is information that says,

8    "During the calls, Haas advised," is the way that the

9    paragraph starts.  So this paragraph is all about

10   information that or statements made by Mr. Haas or

11   information which was contained in the phone calls.

12   That statement that I had --

13            THE COURT:  Tell me --

14            MS. ROBERTS:  If the Court compares the

15   statement included in paragraph 11 of the affidavit

16   and compares that with the actual transcript of the

17   telephone call.

18            THE COURT:  Where is it?

19            MS. ROBERTS:  It is Exhibit E.  And, Your

20   Honor, this is not a pinpoint cite --

21            THE COURT:  Where is it?

22            MS. ROBERTS:  -- for the Court.

23            THE COURT:  Where is it?  You're saying that

24   you have to compare that statement and the affidavit.

25            MS. ROBERTS:  To the phone call.

1          THE COURT:  All right.  And compare it to

2     what statement in the phone call?

3          MS. ROBERTS:  The entire phone call because

4     nowhere in this phone call do you find Mr. Haas

5     requesting nude photos of underage females.

6          Even if the Court were to assume that this

7     conversation is a conversation about underage females,

8     the request for photographs is not a specific

9     request --

10         THE COURT:  Wait a minute.  There's no

11    question that part of this is about underage females.

12    It's 12 to eight.  This is the 12 to eight program.

13    Come on.

14         MS. ROBERTS:  I said excepting the Court's

15    conclusion that it is about -- that the conversation

16    is about underage females, there is still no

17    information, no evidence, no statement in this phone

18    call by Mr. Haas that he was seeking nude photos.  It

19    is true that this phone call supports the statement

20    that Mr. Haas requested photos.  However, there's no

21    statement with regards to anybody being unclothed.  As

22    a matter of fact, Your Honor, it is just as likely

23    that the request was for a face shot.  So that Mr.

24    Haas --

25         THE COURT:  What request?  I'm trying to see

1    what you're talking about to find what to compare it

2    to.

3              MS. ROBERTS:   Your Honor, that's the problem.

4              THE COURT:   No.   You just made -- you just

5    said, It's more likely that the request is for a face

6    shot.   That connotes that you're looking at something

7    in there that constitutes a request.   Where is that?

8    I don't see it.   But I haven't gone back to read the

9    whole thing all over again.   Where is it that you're

10   talking about in your sentence?

11             MS. ROBERTS:   Your Honor, in the middle of

12   page 2 of the call, Haas states, "Get me some

13   pictures, too, man, because I can like set it up to

14   where we can make some money beforehand."

15             Okay.   CW replies, "Okay.   And how does it

16   work with, um, like the way that you do it?   Is it

17   like the, um, the younger the more moolah or?"

18             Haas replies, "Yeah."

19             CW says, "Yeah?"

20             Haas, "Yeah.   Yep.   Yep."

21             CW says, "All righty then.   We'll see what I

22   can do."   And laughs.

23             That is the substance of the conversation

24   with regards to a request for photos.   And there it is

25   clear from the plain language contained in the

1  telephone call and the transcript here that there is

2  no request for a nude photo.  He requests photos.  The

3  assumption by the agent is that it is a nude photo and

4  that is a misleading statement, and a statement which

5  represents the true nature and context of the

6  information contained in the call.

7       Your Honor, those are the material -- just a

8  moment.

9       Your Honor, those are the material omissions

10  and/or intentional misrepresentations.

11       THE COURT:  I only have one intentional

12  misrepresentation.  Haas's statement appears on page

13  12 of the affidavit.  Haas also requested nude photos

14  of underage females in exchange of money, and you want

15  me to compare that to the transcript Exhibit E, page

16  2, beginning with the statement, "Get me some

17  pictures, too, man, because I can like set it up to

18  where we can make some money beforehand."  And it goes

19  all the way down to the -- looks like that

20  conversation goes all the way down to the bottom of

21  page 2 over to page 3.

22       MS. ROBERTS:  That's correct, Your Honor.

23  And I believe that the last portion of that ends with

24  CW at the top of page 3 starting, "Yeah, baby.  I'm

25  all about that moolah" or "I'm all about my moolah."

1          Your Honor, based upon the omissions that
2    I've identified and the misrepresentation that I've
3    identified, I do believe that the defendant has met
4    its burden in making a prima facie showing that the
5    warrant contained both material omissions and at least
6    one intentional misrepresentation.

7          As such, Your Honor, I would ask the Court to
8    reconsider its ruling with regards to a *Franks* hearing
9    on the matter.

10         THE COURT:  What are we going to do in a
11   *Franks* hearing that we haven't already done?

12         MS. ROBERTS:  Your Honor, reconsider a ruling
13   based upon violations -- the violations that we've
14   identified.  I do not believe that there's any
15   additional evidence at this point that we would have.

16         THE COURT:  All right.  Let me hear from the
17   government on that issue.

18         Do you agree, Ms. Mansfield, that there is no
19   mention in the affidavit that CW was a felon, that she
20   was on probation, that she was pending charges, that
21   there was a felony warrant for a Henrico arrest for
22   providing false identification and forging her
23   sister's signature?  Do you agree those were not in
24   the affidavit for the search warrant here being
25   challenged?

1    MS. MANSFIELD:  I agree that they were not in

2    the affidavit, Your Honor, and as to just No. 4 in

3    that, the felony warrant, I just want to clarify.  I

4    believe -- those, as it was testified to, if my memory

5    is accurate, the agent testified that they took her to

6    her court date, and she was arrested for felony

7    charges in Henrico.  I don't know that the evidence is

8    that there was a pending felony active warrant.  I

9    believe it was just --

10    THE COURT:  Once she told them what happened,

11    they arrested her?

12    MS. MANSFIELD:  Correct, Your Honor.  It goes

13    to the pending charges.

14    THE COURT:  That's actually four things.

15    MS. MANSFIELD:  Yes, Your Honor.

16    THE COURT:  Okay.  A felony arrest for the

17    Henrico making false statements and forging documents

18    in relation to the traffic stop.

19    MS. MANSFIELD:  To the traffic stop, yes,

20    Your Honor.

21    THE COURT:  All right.

22    MS. MANSFIELD:  And, obviously, as Your Honor

23    is aware, the defendant must first make the

24    substantial preliminary showing that a false statement

25    was knowingly and intentionally or with reckless

1    disregard for the truth included or in the instance of

2    an omission, Your Honor, that it was an omission that

3    was designed to mislead the magistrate.  And in this

4    case, Your Honor, it's the government's position the

5    defendant has not made that showing given all of the

6    other information and all of the other steps that this

7    agent took and testified that he took and is included

8    in the affidavit to corroborate the testimony -- the

9    information that was provided by that witness.  And

10   the corroboration of an informant or of a witness,

11   complainant in this case, is -- excuse me.  The degree

12   to which the report is corroborated is an important

13   consideration pursuant to *United States v. Wilhelm*, 80

14   F.3d 116, and I submit, Your Honor, that this

15   affidavit sets forth a bevy of corroboration of what

16   the witness was telling the agents that demonstrates

17   that the omissions of her felony and of the pending

18   charges were not omitted designed to mislead the

19   magistrate in this case.

20          As the agent testified, he was unaware of --

21   at the time of this affidavit what exactly the witness

22   was on probation for, although he was aware clearly,

23   very aware, of the nature of the pending charges in

24   Henrico and the false statement made to the probation

25   officer, but he did not just rely on this witness's

1    statements and omit that information.  He took very

2    specific steps to corroborate what CW told him in that

3    case including taking the phone number, running that

4    through a database, confirming that it came back to

5    Mr. Haas, showing her a picture of Mr. Haas that she

6    then identified, and when she represented to the

7    agents that he was continuing to have conversations

8    with her about producing child pornography, and that

9    he drove a light-colored Jetta, they confirmed that he

10   drove a light-colored Jetta, and then they had her

11   ultimately make the recorded phone calls, Your Honor.

12            And I would submit that the recorded phone

13   calls corroborate what the witness -- the information

14   that the witness provided to the agents because

15   without the context it's just quite clear from the

16   phone calls, the government submits, that they're not

17   referring to anything except child pornography.  And I

18   can address that when we get to the subtext of the

19   phone calls.  But the agents took that additional step

20   to corroborate the witness.  And then, as well, this

21   obviously was not an affirmative step they took, but

22   further corroboration for the magistrate to consider

23   is the complaint from the Richmond Police Department

24   or ultimately Richmond originating to Chesterfield

25   dealing with a minor alleging molestation by Mr. Haas,

1   which corroborated the witness saying that Mr. Haas

2   told her he had access to children and that they could

3   produce this child pornography.

4        So I submit, Your Honor, that although these

5   statements were omitted, they were not omissions

6   designed to mislead the magistrate.  They are not

7   material to the probable cause given all of the

8   corroboration in this affidavit in that the defense

9   has not made a prima facie showing to obtain a *Franks*

10  hearing on that matter.

11       THE COURT:  What about the material omission

12  from Exhibit B, page 16, paragraph 25, the failure to

13  include two laptop computers were seized from the

14  defendant's home, thereby making it likely, according

15  to the defense, that the laptop seen by CW in May was

16  not the one in the defendant's truck?

17       MS. MANSFIELD:  Your Honor, I would submit

18  that this is not at all material to probable cause.

19  As this court is aware, on the basis of the home

20  search warrant, the agents were authorized to seize

21  all computers to search and ultimately to determine if

22  there were records related to evidence of crimes.

23       Obviously, CW stated that it was a laptop

24  computer that she viewed child pornography on, but

25  there would be no way -- CW did not give any

1  information and without performing a search there

2  would be no way for the agents to be aware of how many

3  laptops Mr. Haas had.

4       THE COURT:  But why wasn't it relevant to

5  know that two laptops had been seized, not from the

6  standpoint of the defendant's argument, but from the

7  standpoint of the government's argument?  The seizure

8  of two laptops from the home confirms that he's a user

9  of laptops, and when they saw the laptop in the truck,

10  they had authority to seize it, and they got the

11  warrant to seize it.

12       MS. MANSFIELD:  That's correct, Your Honor.

13  I would agree with that that they had the authority to

14  seize it.

15       Additionally, in paragraph 27, subsection D

16  of the search warrant authorizing the search and

17  seizure of that laptop, it's page 17 of Defense

18  Exhibit B -- excuse me.  Page 18.  I apologize, Your

19  Honor.  There's information included in the search

20  warrant about individuals who do possess, collect, and

21  receive child pornography often maintain their

22  collections in a digital or electronic format in a

23  safe, secure, and private environment such as a

24  computer.  And it goes on to say that these

25  collections are often maintained for several years and

1    are kept close by, usually at the collector's

2    residence or inside the collector's vehicle to enable

3    the individual to view the collection, which is valued

4    highly.

5            And I would submit, Your Honor, that that

6    combined with this laptop being with Mr. Haas in his

7    work truck further supports the probable cause in that

8    it's not -- and that's why it's not -- I guess to Your

9    Honor's point, it could have definitely supported the

10   government's position that Mr. Haas was a user of

11   laptops to include it, but I would submit that it is

12   not --

13           THE COURT:  And that he kept the laptop in

14   his vehicle close by so he would be able to see them.

15   What was it?  A tractor-trailer?

16           MS. MANSFIELD:  It was more of a work truck.

17   I have -- there's a photograph, Your Honor.

18           THE COURT:  It looks like a tractor of a

19   tractor-trailer.

20           MS. MANSFIELD:  That's correct, Your Honor,

21   yes.

22           THE COURT:  Did he drive tractor-trailers?

23   Is he a trucker?

24           MS. MANSFIELD:  It's my understanding, Your

25   Honor, he had a tree service business.  I believe that

1   may have involved the driving of tractor-trailers,

2   although I'm not fully sure of what the extent of his

3   work with this tractor-trailer was.

4           THE COURT:  What about the intentional

5   misrepresentation of Exhibit B, page 12, Haas also

6   requested nude photos of underage females in exchange

7   for money?  And she compares that to the transcript on

8   Exhibit E, page 2, where it talks about getting

9   pictures but doesn't talk about getting nudes.

10          MS. MANSFIELD:  Well, I think, Your Honor,

11  again, if we look at this as being informed by the

12  background that CW has said that he's constantly

13  asking her about the production of child pornography,

14  I think that Your Honor can -- it is a logical

15  conclusion, and a logical conclusion that certainly

16  the agents made and CW made that making -- excuse me.

17  This whole production has been about CW discussing

18  with Mr. Haas producing child pornography so that they

19  can make money.

20          THE COURT:  Well, according to paragraph 12,

21  it says, "CW understood Haas to be referring to the

22  production of child pornography.  Haas also requested

23  nude photos of underage females in exchange for

24  money."

25          Isn't a fair reading of that is that he is

1    reciting what CW told him about what it is that she

2    understood at the telephone calls?

3                MS. MANSFIELD:  Yes, Your Honor.

4                THE COURT:  The whole paragraph has to do

5    with what CW --

6                MS. MANSFIELD:  Right, with what she

7    understood the context of this phone call to be.

8                THE COURT:  By that same token, the defense

9    says, well, he had a transcript of these phone calls,

10   and there isn't anything in there that would permit

11   reasonably the conclusion that the agent doing the

12   affidavit thought that CW understood that the

13   reference to pictures meant nude pictures in that one

14   sentence there.

15               MS. MANSFIELD:  But I think it is, Your

16   Honor, when you look at the answer given right to that

17   by CW.  "How does it work?  Is it like the younger,

18   the more moolah?"  And he says, "Yeah."  I think it is

19   a logical conclusion when discussing child pornography

20   that to make money or more money, the photographs are

21   very unlikely to be --

22               THE COURT:  Well, are you going to make a lot

23   of money from a child dressed in a pinafore or a prom

24   dress --

25               MS. MANSFIELD:  No, Your Honor.

1          THE COURT:   -- or a confirmation dress or

2     something like that or are you going to make more

3     money from a child without clothes on?

4          MS. MANSFIELD:  Yes, Your Honor.

5          THE COURT:   That's your point, that's the

6     inference that can we made from this?

7          MS. MANSFIELD:  Yes, Your Honor, that's my

8     point.

9          THE COURT:   Anything else on *Franks*?

10         MS. MANSFIELD:  If I may, I believe I didn't

11    address specifically what defense argued was their

12    second material admission.

13         THE COURT:   Omission.

14         MS. MANSFIELD:  Omission, yes, Your Honor.

15    From --

16         THE COURT:   You don't need to argue that.

17         MS. MANSFIELD:  Oh, okay.  Thank you, Your

18    Honor.

19         THE COURT:   Anything else on *Franks*?  I'd

20    like to go on and get that done.

21         MS. ROBERTS:  Yes, Your Honor.  Your Honor,

22    with regards to the seizure of the laptop, and the

23    government's directing the Court's attention to the

24    agent's statements in the affidavit regarding

25    characteristics of a person who possesses child

1    pornography, specifically I think the

2    government referenced --

3              THE COURT:   It's on page 18, paragraph --

4              MS. ROBERTS:   25 or 27, Your Honor.

5              THE COURT:   27D.   D at the top of page 18.

6    "Likewise, individuals who access with intent to view,

7    possess, collect, and receive child pornography often

8    maintain their collections that are in digital or

9    electronic format in a safe, secure, and private

10   environment such as a computer and surrounding area.

11   These collections are often maintained for several

12   years and are kept close by, usually at the

13   collector's residence or inside the collector's

14   vehicle to enable the individual to view the

15   collection, which is valued highly."

16             MS. ROBERTS:   Your Honor, yes, I would direct

17   the Court to paragraph 27C.   Well, first, to paragraph

18   27C, which immediately precedes the paragraph cited by

19   the government, which is on page 17.

20             THE COURT:   Okay.

21             MS. ROBERTS:   And that reads, "Individuals

22   who access with the intent to view, possess, collect

23   and receive child pornography almost always possess

24   and maintain their hard copies of child pornographic

25   material, that is their pictures, films, videotapes,

1  magazines, negatives, photographs, correspondence,

2  mailing lists, books, tape recordings, etc., in the

3  privacy and security of their home or some other

4  secure location.  Individuals who have a sexual

5  interest in children or images of children typically

6  retain pictures, films, photographs, negatives,

7  magazines, correspondence, books, tapes, recordings,

8  mailing lists, child erotica, and videotapes for many

9  years."

10        THE COURT:  That's talking about hard copy

11  material, right, not digital?

12        MS. ROBERTS:  Hard copy material is defined

13  as pornographic material including pictures, films,

14  videotapes, magazines, negatives, correspondence.  And

15  so in that, Your Honor, I don't think that it is

16  necessarily --

17        THE COURT:  This paragraph C looks to me like

18  it's talking about non-electronic formats, non-digital

19  formats.  Isn't that what paragraph C is?  Paragraph D

20  talks about digital formats.  Am I not right about

21  that?

22        MS. ROBERTS:  That is correct, Your Honor.

23        THE COURT:  All right.

24        MS. ROBERTS:  In both instances it indicates

25  that it is likely that these items are kept in a safe

1    and secured location.  The facts of this case don't --

2         THE COURT:  The one about the digital says

3    including inside the vehicle.

4         MS. ROBERTS:  I understand that, Your Honor.

5    But even to that point, what the evidence -- well,

6    first I will say that with regards to the agent's

7    statements and conclusions, the agent's conclusory

8    statements as contained in paragraphs 27 and the

9    entire section, "Characteristics common to individuals

10   who access with the intent to view, collect, receive

11   child pornography and to seek to sexually exploit

12   children," that is exactly the type of conclusory

13   statements that the Court warns are insufficient to

14   establish probable cause.  Specifically, Your Honor,

15   in *United States v. Lull* -- I'm sorry.  One moment.

16        THE COURT:  You're talking about the validity

17   *vel non* of the affidavit.  We're talking about now

18   misrepresentation.  Why are you talking about this

19   now?

20        MS. ROBERTS:  Your Honor, only that the

21   government raised the issue to say --

22        THE COURT:  Well, let's don't worry about

23   what the government is going to do anymore unless

24   there is specifically some comment that she said.  And

25   they didn't get into testing this validity *vel non* of

1    the warrant in this argument. They were addressing

2    only the comments you made.

3         MS. ROBERTS: In that case, Your Honor --

4         THE COURT: You're mixing these arguments

5    together, and that's not how they are to be

6    considered.

7         MS. ROBERTS: Yes, Your Honor.

8         With regards to the intentional

9    misrepresentation regarding nude photos, the

10   government argued that Agent Gonzalez's

11   misrepresentation could not have been intentional.

12   However, we would point out that during his

13   testimony --

14        THE COURT: Said it wasn't a

15   misrepresentation was her argument. Her argument was

16   it wasn't a misrepresentation when you look at the

17   whole thing, particularly talking about the fact that

18   the pictures were intended to yield money, and that

19   the more money that you get -- you don't get money for

20   clothed children. You get money for naked children.

21   That's the point she was making. So address that.

22        MS. ROBERTS: Your Honor, Agent Gonzalez's

23   statement in the affidavit does not say that Mr. Haas

24   requested photos in exchange for money. They say that

25   he requested nude photos. It specifies nude photos.

1    And that is a conclusion by --

2         THE COURT:  No, it's an inference.  It's an

3    inference based on the text of a whole two pages that

4    basically says this:  I want some pictures, 12 to

5    eight-year-olds.  And I want to make moolah from it.

6         Now, she says the officer was reasonable in

7    inferring that you make pictures from nude

8    photographs, not clothed photographs of the 12 to

9    eight-year-olds referred to in that passage.  And if

10   that's true, is that an intentional misrepresentation?

11        MS. ROBERTS:  I still believe that it is,

12   Your Honor, and it overstates the evidence.  And with

13   regards to the inference, Your Honor, it is also an

14   acceptable inference or it stands to reason, common

15   sense, that an individual or a child, in this case,

16   who a person wants to photograph or use for purposes

17   of presenting child pornography, that you want someone

18   with an attractive face.  And so, again, that may not

19   be the end, but at least the pictures that are

20   requested, it is just as likely that he is requesting

21   a picture of a head shot, and that's not ruled out

22   that he is first wanting to see a preliminary picture

23   of this individual to include perhaps a head shot.

24        THE COURT:  A head shot is not pornography.

25        MS. ROBERTS:  A head shot is not pornography,

1  nor is a clothed picture of a child where you can see

2  the child's proportions.

3         THE COURT:  Is there any other rebuttal that

4  you have?  Because I really would like to get on to

5  the merits of the case if you don't have anything

6  else.

7         MS. ROBERTS:  No, Your Honor.

8         THE COURT:  All right.  I will have an

9  opinion, but the request for a treatment of this under

10  the *Franks* analysis, it fails.  There hasn't been any

11  showing sufficient to warrant a *Franks*-type resolution

12  in this case.  So we now turn to the issue of the

13  validity of the search.

14         MS. ROBERTS:  Your Honor, our second argument

15  is that notwithstanding the Court's ruling that we've

16  not made a prima facie showing regarding the presence

17  of intentional misrepresentations and material

18  omissions in the affidavit, the warrant still fails to

19  establish probable cause under a totality of the

20  circumstances analysis.

21         THE COURT:  Do you agree -- as I understand

22  it, just so I lay the table correctly, we're not

23  considering the validity of the warrant to search the

24  home?

25         MS. ROBERTS:  That is correct, Your Honor.

1           THE COURT:  All right.

2           There is no attack on any part of that?

3           MS. ROBERTS:  There was no material recovered

4     which the government seeks to introduce at trial in

5     this matter.  They recovered some things but none of

6     it is of an incriminating nature.

7           THE COURT:  You don't think the warrant in

8     that case was bad, though, do you?

9           MS. ROBERTS:  Well, I do have --

10          THE COURT:  You think the warrant was bad

11    here?

12          MS. ROBERTS:  I think the warrant was bad

13    there for a lot of the same reasons that the warrant

14    was bad here in that -- and the reasons that I'm going

15    to articulate with regards to the face of the warrant.

16          THE COURT:  The bottom line here is that

17    there is an amplitude of evidence showing that this

18    fellow was interested in child pornography from a

19    confidential witness or informant, however you want to

20    call it, that establishes firsthand knowledge that it

21    was on a computer and that he has had a longstanding

22    interest in children and child pornography.  And I

23    don't see that there's anything wrong with the warrant

24    for the house.

25          MS. ROBERTS:  Your Honor --

1          THE COURT:  You didn't attack it.

2          MS. ROBERTS:  The warrant for the house and

3    the warrant for the 1995 tractor-trailer truck are

4    identical in every respect except for the inclusion by

5    the affiant in paragraph 25 of the September 1st

6    affidavit for search warrant.  They read verbatim, the

7    exact same information, except the September 1st

8    updates the magistrate judge and advises that a search

9    of the home pursuant to the August 31st, 2016 warrant

10   had been executed.  And then it advises the magistrate

11   judge that Mr. Haas was taken into custody at a

12   different location and that he was arrested on the

13   charges which we've been referring to as the charges

14   out of Chesterfield County involving the 11-year-old.

15   It advises the magistrate judge that a laptop computer

16   was located on the seat in that work truck and that a

17   GPS device was located --

18          THE COURT:  Before you go any further, I have

19   up here two things marked Defense Exhibit B.  One is a

20   search and seizure warrant with an execution demand of

21   9-14-2016, and an execution demand on the other one

22   for 9-15-2016.  And one of them is signed by the

23   magistrate judge on August 31 at looks like 10:30 a.m.

24   and the other one is signed on September the 1st,

25   2016, at 11:05 a.m.  Which is the right B?

1        MS. ROBERTS:  Your Honor, the correct B is

2  signed September 1st, at 11:05 a.m.

3        THE COURT:  What is this thing that I have

4  here on Exhibit B?  I mean on the other one.

5        MS. ROBERTS:  That is Exhibit C.

6        THE COURT:  So I have one that looks like

7  Exhibit C.  So I'm returning this B to you, the second

8  B to you.  The one I'm returning actually is Exhibit

9  C.  Somebody has written over here.  Okay.

10        Was the magistrate judge ever told that they

11  seized two computers at the defendant's house?

12        MS. ROBERTS:  He was not, Your Honor.

13        THE COURT:  Does that make a difference that

14  they did?

15        MS. ROBERTS:  Your Honor, I believe it does

16  make a difference.

17        THE COURT:  Is there any evidence that the

18  affiant knew that two computers had been seized at the

19  house?

20        MS. ROBERTS:  Yes, Your Honor.  Through his

21  testimony here in court today I specifically asked him

22  whether or not he was present when the two laptops

23  were recovered.

24        THE COURT:  He said he was present, but he

25  said he didn't know that they had been seized.

1        MS. ROBERTS:  No, Your Honor, that is not my

2   recollection of his testimony.  It was that he was

3   present, that he did not specifically retrieve them or

4   seize them, but that yes, he knew -- I think he said,

5   I probably knew at the time of the swearing out of

6   that second search warrant.  He specifically affirmed

7   the statement that he had knowledge of the two laptop

8   computers.

9        THE COURT:  Well, I don't recall that being

10  his testimony, but you all will have a chance to deal

11  with it.  All right.  Go ahead.

12       MS. ROBERTS:  Your Honor --

13       THE COURT:  What more does the government

14  have to show here to get a warrant, to have a valid

15  warrant?  There's not any real doubt.  They have

16  probably cause to believe that he has child

17  pornography on his computer.  He talks about it all

18  the time.  The warrant authorizes the search, the

19  seizure of the computers at home, and they found

20  another one in his truck, so it authorizes the one at

21  the truck.  What is your objection to all this?

22       MS. ROBERTS:  Your Honor --

23       THE COURT:  Other than the reliability,

24  credibility of the CW?

25       MS. ROBERTS:  Well, Your Honor, when an

1    officer has reason to know that the information

2    provided by a source is perhaps questionable --

3              THE COURT:  I'm not helping you here.  I'm

4    sorry.  Let me start again.  Let's assume that I found

5    that there isn't any problem with what he did with

6    respect to the credibility of CW, that that is

7    sufficient unto the day.  Given that there's no basis

8    for an attack on that theory at all, in other words,

9    he didn't mislead anybody, what he put in there was

10   fine, what he left out doesn't make a difference.

11             Now, with all the evidence that CW provided

12   and the evidence that they corroborated, and the

13   evidence of the telephone calls, why isn't that enough

14   to authorize the warrant both in the house and at the

15   truck once they found the computer in the truck?

16             MS. ROBERTS:  If the Court were -- assuming

17   that the Court credits CW, that would thereby lend the

18   information in the affidavit as being reliable, and if

19   the Court were to view the affidavit or the

20   information provided by CW as being reliable

21   information, then I think that we would have a problem

22   asserting that the warrant is not valid on its face.

23             THE COURT:  Right.  So the real rub here is

24   CW's reliability and credibility; is that right?

25             MS. ROBERTS:  That is, Your Honor.

1      THE COURT:  That's the gravamen of what
2  you're attack is; is that correct?
3      MS. ROBERTS:  That's correct.
4      THE COURT:  Well, let's argue that then.
5  I'll be glad to hear you on that.  I'm just trying to
6  define issues.  Now that I know that the issue here is
7  the credibility/reliability of CW and whatever the
8  evidence is that was given or was not given is
9  dispositive of whether the warrant is valid or not,
10  I'll hear your argument on the whole credibility
11  issue, if you don't mind.  And I recognize there's
12  some overlap between what you argued about omissions
13  in the *Franks* context and this topic, but I'm willing
14  to hear -- I understand that it has different thrusts
15  and different contexts.  So I'll be glad to hear you
16  argue that even if you repeat yourself on this point
17  now that I know what the dispositive issue really is.
18      MS. ROBERTS:  Yes, Your Honor.
19      Your Honor, on the face of the warrant, the
20  four corners of the warrant provides certain
21  assertions that go to the issue of probable cause.
22  The assertion by CW that she actually observed child
23  pornography on the computer in May of 2016.  Second,
24  there is the assertion in the affidavit and search
25  warrant by CW that she engaged in multiple

1   conversations with Mr. Haas in which Mr. Haas

2   continuously requested nude photos of children and

3   requested CW -- that CW obtain a juvenile female for

4   purposes of engaging in sexual conduct with Mr. Haas.

5         THE COURT:  Mr. Haas or with her?  I thought

6   that part of it was that he was -- it was to engage

7   with her so that he could film it.  Isn't that what

8   the agent said?

9         MS. ROBERTS:  I don't recall that it was

10  exclusive to her.

11        THE COURT:  No --

12        MS. ROBERTS:  As --

13        THE COURT:  No, he wanted to have sex with

14  some people himself, but he wanted it -- as far as

15  child pornography is concerned, he wanted CW to engage

16  in sex with the child so that he could film it.  Isn't

17  that what we've been told?

18        MS. ROBERTS:  Your Honor, I don't believe

19  that it is, that it was specified that an underage

20  female would have sex with CW as opposed to the

21  underage female having sex with Mr. Haas or some other

22  person or persons.  That is not to say that -- I guess

23  there are all kinds of inferences that have been made,

24  so there's nothing to rule out the possibility that

25  the sexual interaction was supposed to be between

1  Haas, CW, and an underage individual, but I just don't

2  think that the evidence is clear on that one way or

3  the other.

4         THE COURT:  All right.  Excuse me.

5         MS. ROBERTS:  Your Honor, in addition, the

6  other piece of evidence found in the affidavit which

7  goes to probable cause would be the phone calls that

8  occurred between CW and Mr. Haas.  Those phone calls

9  when viewed and reviewed --

10        THE COURT:  Are you talking about the ones

11 that are recorded and we have transcripts for?

12        MS. ROBERTS:  Right, it is the recorded phone

13 calls that have been entered into evidence today that

14 are referenced in the search warrant.  The search

15 warrant also, however, references at least two other

16 phone conversations, and one in person conversation

17 that allegedly occurred between CW and Haas prior to

18 agents setting up the recorded phone call.  Those two

19 calls, the earlier calls and the earlier in person

20 conversation, were not recorded in any way, and so the

21 substance of that is based strictly on CW's account of

22 that.

23        THE COURT:  The substance of what?

24        MS. ROBERTS:  The substance of those earlier

25 conversations as reflected in the affidavit, and the

1    substance of the earlier phone calls as reflected in

2    the affidavit.

3         THE COURT:  Excuse me.  I thought you were

4    starting to talk about the phone calls in Exhibits E

5    and F.  You started off and then you drifted off and

6    you talked about the fact that there were other phone

7    calls.  Let's confine ourselves first to the recorded

8    phone calls.  And you say that they are probative of

9    no probable cause.  How is that so?

10        MS. ROBERTS:  Your Honor, it's our position

11   that they are not probative at all when viewed without

12   some other explanation or background story to give

13   them context.

14        THE COURT:  The background story being --

15        MS. ROBERTS:  CW's allegation that there were

16   two previous phone conversations that were not

17   recorded and for which agents were not privy to, and

18   an in person meeting with Haas during which they

19   engage in conversations about child pornography.

20        THE COURT:  What about all this?

21        MS. ROBERTS:  Well, Your Honor --

22        THE COURT:  He swore to the fact that CW told

23   him about the original meeting in May, about her

24   meeting him four years before, approximately in 2012,

25   and what she said the contents were of the two earlier

1   conversations.

2          MS. ROBERTS:   Your Honor, but none of that

3   information was corroborated.   Although the agent took

4   time to corroborate just basic general information

5   such as CW's name, her address, her phone number, he

6   didn't conduct any or obtain any information that

7   provided any corroboration for the meaningful

8   allegations that she lodged against Mr. Haas.

9          The fact that he verified her name, date of

10   birth, and address does not bear on whether or not she

11   is a credible source.   What bears on whether or not

12   she's a credible source are all the things that this

13   court has heard today with regards to her prior felony

14   convictions, to her pending charges, to her lying to

15   Henrico police in July of 2016 about 45 days before he

16   swore out the affidavit.

17          All of those are red flags to this officer,

18   to this agent, that even if he hadn't originally done

19   a due diligence check to find out the record and the

20   voracity of the person that he was dealing with, that

21   when these things occurred and they kept on popping

22   up, that he had then -- that it was unreasonable for

23   him to not conduct a criminal records check.

24          She told him that she had been convicted of

25   offenses in Chesapeake previously.   So it wasn't that

1  he was assuming she didn't have a record because she

2  told him she had a record.  She also told him that she

3  was on probation.  He says that she didn't tell him

4  why -- that CW didn't tell him why she was on

5  probation, but the fact that she told him that she was

6  on probation, the fact that he knew she had a prior

7  criminal record would prompt any reasonable officer

8  relying on a person's statement to look into their

9  criminal history and their record for truthfulness.

10  He didn't do that.  He intentionally disregarded that

11  information, and I think we can assume that it was

12  not -- that it was for the purpose of not wanting to

13  know that information and not having to include it.

14         Even if you find that it wasn't an

15  intentional misrepresentation on his part, under the

16  good faith exception to the exclusionary rule, prong

17  one says, "The magistrate or judge issuing a warrant,

18  the good faith exception will not apply if the

19  magistrate or judge issuing a warrant was misled by

20  information in an affidavit that the affiant knew was

21  false or would have known was false except for his

22  reckless disregard for the truth."  And that is what

23  we have here.  There were --

24         THE COURT:  Well, you don't allege it was

25  false.

1      MS. ROBERTS:  At this prong, Your Honor, at

2   this point I think that the Court has already made a

3   ruling on that.  And so I stand now --

4      THE COURT:  You don't contend it was false

5   anyway.  False means you intended to say something

6   misleading.

7      MS. ROBERTS:  They were --

8      THE COURT:  The only intentional

9   misrepresentation --

10      MS. ROBERTS:  Is with regards to the nude --

11      THE COURT:  Yeah.

12      MS. ROBERTS:  Right.  This is a material

13   omission that was made in reckless disregard for the

14   truth.  And if the Court so finds, then the good faith

15   exception fails in this case.

16      So that is why CW's credibility or her

17   history of voracity as known to Agent Gonzalez at the

18   time that he swore out the affidavit is so incredibly

19   important.  The information contained in the

20   affidavit, save the information with regards to the

21   Chesterfield offense, is wholly provided and based

22   upon the acceptance of the source as being a reliable

23   source.

24      And so, Your Honor, in addition to that, on

25   the face of the warrant, in the four corners of the

1    warrant there's not even an allegation in the

2    affidavit that CW was reliable.  And in United States

3    v. *Lull*, 824 F.3d 109, which was a Fourth Circuit case

4    from 2016, it stands for the proposition that the

5    affiant's omission of the informant's problematic

6    reliability in the affidavit prevented a neutral

7    magistrate from being able to accurately assess the

8    reliability and voracity of the informant's

9    statements.

10           So in this case, as applied to these facts,

11   Agent Gonzalez's failure to even allege the

12   reliability of the CW in the instant affidavit and

13   warrant is exactly the same as the situation in *Lull*

14   in which the Court found that that was problematic and

15   that that prevented the magistrate from performing his

16   duties.

17           In addition to that, any affidavit that omits

18   all of the informant's credibility undermines the

19   issuing magistrate's ability to perform his role as a

20   neutral arbiter of probable cause.

21           THE COURT:  Is that *Lull*?

22           MS. ROBERTS:  That is *Lull*, Your Honor, yes.

23           Your Honor, our second argument is that the

24   affidavit -- on the face of the affidavit, the face of

25   the warrant, that the affidavit fails to establish a

1  sufficient nexus between the criminal conduct, the

2  place to be searched, and the items to be seized.

3  First, the evidence of child sexual assault alone does

4  not support probable cause to search for child

5  pornography.

6          THE COURT:  So wait a minute.  There's a

7  nexus between what?

8          MS. ROBERTS:  The nexus between the criminal

9  conduct alleged, and the place to be searched, and the

10  items to be seized.

11          Again, if the Court ultimately rules that CW

12  is credible, then there would be -- the Court would be

13  making a finding that the information provided by her

14  in the warrant was properly considered.  However, if

15  the Court decides that CW is not reliable and that

16  that is an issue that is fatal to the government's

17  case, then what that leaves us with is only evidence

18  of the child's sexual assault as it relates to the

19  Chesterfield offense.  But there the 11-year-old never

20  asserted the presence or use of a laptop, never

21  asserted the presence or use of a camera or other

22  device used or associated with child pornography.

23  There was no mention that Haas took pictures, that he

24  displayed images to her or anything of that nature.

25  And finally, there was no GPS device, no evidence that

1    there was a GPS device present.

2         THE COURT:  What's the GPS device have to do

3    with this case?  Are they offering it into evidence?

4    To show what?

5         MS. ROBERTS:  Your Honor, we have reviewed --

6         THE COURT:  Are you offering it into evidence

7    to show what, Ms. Mansfield?  There's really no

8    discussion in the papers about the GPS at all.

9         MS. MANSFIELD:  That's correct, Your Honor.

10   We will state on the record we're not offering the GPS

11   device into evidence.

12        THE COURT:  Okay.  So that's irrelevant.

13        MS. ROBERTS:  Your Honor, finally, there's no

14   indication that the laptop observed by law enforcement

15   in the tractor-trailer on September 1st is the same

16   laptop allegedly viewed by CW in May of 2016.

17        What you heard here today -- I'm sorry.  What

18   is contained in the affidavit is a statement that CW

19   observed a laptop.  There's no description provided in

20   the affidavit that would allow law enforcement

21   officers to be able to identify with particularity or

22   specificity the item that they are searching for in

23   the home.  Certainly, the record is absent of any

24   description whatsoever.

25        It is convenient today that Agent Gonzalez on

1  the stand, when asked on the stand said that CW told

2  him that it was a black laptop.  That is information

3  that would have been relevant and material and that

4  should have been --

5      THE COURT:  What was seized from the truck?

6      MS. ROBERTS:  Your Honor, there was a black

7  laptop seized from the truck.  That statement that it

8  was a -- that she said "black laptop" does not appear

9  in the affidavit and had we been able to explore the

10  substance of the report as part of our case-in-chief

11  for *Franks*, then we would have been able to present

12  evidence to the Court that it did not appear in either

13  of his reports.  Specifically, the report that

14  detailed the statements CW made.

15      Now, that report's not into evidence.  The

16  Court did not allow that, but right now the government

17  has the report, and I'm not sure if they're willing to

18  stipulate that the report does not indicate that there

19  is a description.

20      THE COURT:  It's either in there or it's not.

21      MS. ROBERTS:  Right.  But the report itself

22  is not included in the material that the Court has.

23  The government objected to our moving it into

24  admission.  The absence of this information in the

25  report and the absence of the information in the

1    affidavit --

2            THE COURT:  You didn't offer it into evidence

3    to show the color of the laptop.  You offered it to

4    impeach him about something else.  I never was called

5    upon to rule on such an issue as that that I recall.

6            MS. ROBERTS:  No, Your Honor, at the

7    conclusion --

8            THE COURT:  Yeah, you had it out.  You

9    offered it.  Yes, I kept it out.  But you had used it

10   only to impeach him about something that didn't have

11   to do with the color of the laptop, and he admitted

12   what it was that you wanted him to answer, and she

13   objected on that basis, and I held that the statement

14   was not admissible to impeach him, that there was no

15   impeachment and therefore no need to admit the report

16   that you're talking about.

17           You never raised the issue of the color of

18   the laptop and whether that report was pertinent to

19   that or not.  He testified about the color of the

20   laptop, but you didn't raise that issue.

21           MS. ROBERTS:  Your Honor, if I can have a

22   moment.

23           Your Honor, the government has advised that

24   it is willing to stipulate that the agent's report

25   only references a laptop and that there's no

1   description contained.

2           MS. MANSFIELD:  Yes, it showed pictures on a

3   laptop, Your Honor.

4           THE COURT:  All right.

5           MS. ROBERTS:  Your Honor, if you strip away

6   the statements that are attributed to CW and her

7   credibility, what you're left with is the allegation

8   regarding a touch offense in Chesterfield.  And that

9   alone does not establish probable cause to believe

10  that Mr. Haas is likely to collect or possess child

11  pornography.

12          For that I would refer -- for that

13  proposition I would refer the Court to *Virgin Islands*

14  *v. John*, 654 F.3d 412 at 418 and 419.  That's a Third

15  Circuit case from 2011.  And of course the Court is

16  familiar with the decision in this circuit in *United*

17  *States v. Doyle*.

18          The affidavit failed to provide the

19  magistrate with a substantial basis for determining

20  the existence of probable cause, and, therefore, it

21  fails on its face.

22          Your Honor, finally, the good faith exception

23  does not save what is otherwise a faulty, in our

24  position, of a faulty and invalid warrant where the

25  affidavit -- because in this case, a reasonable

1  officer executing the warrant, given the four corners

2  of the warrant, should have known that the warrant did

3  not contain sufficiently reliable information so as to

4  establish probable cause.

5          The warrant was facially deficient in that

6  the affidavit failed to allege the reliability of the

7  confidential source.

8          So for those reasons, Your Honor, not

9  withstanding the Court's denial of the *Franks* hearing,

10  I believe that on the face of the warrant and when

11  examining the four corners of the warrant, the Court

12  still must conclude that the warrant fails to

13  establish probable cause, and that it fails to contain

14  essential elements such as a statement with regards to

15  the reliability of the source, and that no reasonable

16  officer executing the warrant would have been able to

17  conclude that the warrant was valid given those

18  deficiencies.

19          One moment.  Nothing further, Your Honor.

20          THE COURT:  All right.  Okay.  You have a

21  whole group of things that are omissions, that you

22  acknowledge were omissions.  Why taken together would

23  those omissions not have been important to put before

24  the magistrate judge so he could make a decision about

25  whether CW's statements were sufficiently reliable to

1   constitute probable cause given that CW was the

2   principal, if not exclusive, predicate for the

3   allegations of child pornography on a computer?

4           MS. MANSFIELD:  Well, I think because, Your

5   Honor, there was much other evidence provided to the

6   magistrate in this case that corroborated and

7   demonstrated CW's reliability and the reliability of

8   her statements in this context.

9           THE COURT:  What is that?

10          MS. MANSFIELD:  Again, Your Honor, as Your

11  Honor has recognized, some of this will be repetitive,

12  but the information included in the affidavit that

13  corroborates the information that CW was giving to the

14  agents, first of all, when CW gave the agents a phone

15  number, the agents ran those records, corroborated

16  that that went back to Richard Haas and pulled those

17  phone records for that phone, which is included in the

18  affidavit that they confirmed that that phone number

19  is registered to Richard T. Haas, the account number,

20  P.O. Box 35085, North Chesterfield, Virginia.

21          The agents then ran a CLEAR report confirming

22  that that P.O. box does belong to Haas as well and

23  that Mr. Haas's DMV records also would include that

24  P.O. box.

25          THE COURT:  That all goes to show that Haas

1  was who she said he was, right?

2          MS. MANSFIELD:  Well, that's correct, Your

3  Honor.

4          THE COURT:  What does that have to do with

5  corroborating any of the material allegations except

6  that she was dealing with Haas?

7          MS. MANSFIELD:  Well, I guess that's the

8  beginning of it, Your Honor, and then ultimately the

9  agents did perform the two recorded phone calls with

10  CW, had CW do, record her interactions with Mr. Haas

11  in order to corroborate that she was discussing with

12  him the production of child pornography.

13          THE COURT:  All right.  Now, tell me what --

14  that's Exhibits E and F from the defense, right?

15          MS. MANSFIELD:  That's correct, Your Honor.

16          THE COURT:  What part of -- let's take E.  Is

17  it D and E?  It's D and E.  What part of D and E

18  corroborates that?

19          MS. MANSFIELD:  Well, Your Honor, I think

20  looking more so to E, the transcript of the phone

21  call --

22          THE COURT:  You don't think D does?

23          MS. MANSFIELD:  I think that D does, Your

24  Honor, in that it is clear that the two of them -- it

25  is clear from this that the two of them have been in

1    contact with each other, that they know each other as

2    well.  One moment.  He references at the very

3    beginning of that call about one, two, three, four

4    lines into the first page of D.  Haas references two

5    lines into that statement, Anyway, just getting back,

6    and I got to take some shit out to the country right

7    now.  Long story.  Like long story on that shit like

8    we talked about before.

9         So he's referencing clearly things that

10   they've talked about before.  I don't think D

11   corroborates as much as E does, Your Honor, but I do

12   think --

13        THE COURT:  It doesn't corroborate anything

14   that I can see.  What does it corroborate other than

15   they are already in communication with each other and

16   have had previous communication of some sort?  I don't

17   see it.  If it's there, tell me, but I don't see it.

18        MS. MANSFIELD:  She also -- CW, Your Honor,

19   also references about halfway down that first page

20   about picking up one of her girlfriends from

21   Baltimore, which was part of this child pornography

22   scheme that she has discussed with Mr. Haas.  And so,

23   Your Honor --

24        THE COURT:  Where does that appear?  There's

25   no other evidence that I know of about that, about

1  that sentence.  Yeah, one of my girlfriends from down

2  where I'm from.  I'm going to pick her up.  She's

3  going to come up here with me for a while, and then we

4  might go to Baltimore or whatever.  What does it

5  corroborate specifically?

6          MS. MANSFIELD:  Well, I think, Your Honor,

7  it's corroborating that they have been -- that the two

8  of them have discussed certain things prior to this

9  phone call.

10          THE COURT:  Yeah, about a girlfriend coming

11  from Baltimore but not about pornography or anything

12  like that.

13          MS. MANSFIELD:  Well, then I think, Your

14  Honor, to Your Honor's point I'll move on to Defense

15  Exhibit E.

16          THE COURT:  We're going to close the door on

17  D.

18          MS. MANSFIELD:  That's fine, Your Honor.  And

19  move on to E.  This conversation, Your Honor, when

20  read in the -- when the whole conversation is read, I

21  think it is clear that they are talking about -- it's

22  corroborating CW's statements that they have been in

23  touch and continued discussing child pornography.

24          CW begins to discuss this at the top of page

25  2.  Okay.  Cool.  And if I do make that trip to

1  Baltimore, like I've told you before, you can't

2  bullshit because, you know, she can't be riding, you

3  know, the girl around and stuff like that, just

4  everywhere going.  Nobody get pulled over or nothing

5  like that whenever she's on her way down.  And you

6  know how that goes.

7       And Haas says, "Now, if you -- I'm serious.

8  You tell me when that shit's hooked up, man, because

9  that will definitely make you -- make you some, too,

10  man, and I mean a lot actually.  So depending on how

11  it -- I can't say a lot because it just depends on how

12  it works out, but --"

13       CW says, "Yeah."

14       Haas says, "But, dude, definitely hook that

15  up, man.  I'm serious.  Get me --"

16       CW:  How do you -- huh?

17       And then Haas goes into the discussion.

18       THE COURT:  What does that show so far?  I

19  don't that shows anything.

20       MS. MANSFIELD:  Well, I think, Your Honor,

21  then as we get done, and he says that's --

22       THE COURT:  What does it show so far?

23       MS. MANSFIELD:  It shows, Your Honor, that --

24  it's clear that -- I think it's clear from the way

25  this conversation starts that they have discussed CW

1  knows someone who can get a young girl and can bring a

2  young girl to Mr. Haas.

3          THE COURT:  The girl.  It doesn't say the age

4  of the girl.

5          MS. MANSFIELD:  Then if you go down, Your

6  Honor, when he says, Get me some first, too, man,

7  because I can like set it up to where we can make some

8  money beforehand.  CW says, "Okay.  And how does it

9  work with, um, like the way you do it?  Is it like

10  the, um, the younger the more moolah?"

11          THE COURT:  That's one thing.  That part of

12  the conversation doesn't necessarily refer back to the

13  girl in the first paragraph on page 2, does it?

14          MS. MANSFIELD:  I think that it can be read

15  that way, Your Honor.  I think it can read that they

16  are discussing possibly -- they're discussing hooking

17  that up and getting a young girl.  Then they move on

18  to get me some pictures.  We can make some money

19  beforehand.  And then as you move down the

20  conversation, CW says, "Remember, I said an 8 and a

21  12?"  And Haas says, "Yeah, the lower side of that is

22  definitely better."

23          I'm sorry, Your Honor, to skip around.

24  Earlier when CW answers the questions about the

25  pictures, she says, "The younger, the more moolah."  I

1   think this conversation in context in corroborating

2   and informing to the reliability of CW, I can't think

3   of what else they would be discussing, the younger,

4   the more moolah in the context of getting pictures,

5   and "I said I had a 12 and an 8.  The lower side is

6   definitely better."

7           THE COURT:  Well, this corroborates -- I

8   mean, I think it's reasonable to say, to interpret

9   this conversation as saying that he's interested in

10  producing child pornography because he's sufficiently

11  described the taking of pictures, the getting of

12  pictures, and the making of money out of young girls.

13  And I mean that tends to corroborate what she says

14  that he had talked to her about before.  But what does

15  that have to do with the probable cause to believe

16  that there's on the computer in the truck child

17  pornography?

18          MS. MANSFIELD:  Well, I think, Your Honor,

19  the corroboration is an important part of that because

20  the agent's -- the search warrant -- that's how the

21  agents are ultimately able to seize the computer and

22  view the child pornography.  Outside of -- all they

23  could do at this point was corroborate information

24  surrounding the statements that CW had given them.

25          Obviously, based on her statements, Mr. Haas

1   has child pornography on a computer.  The agents can

2   corroborate many details of what Mr. Haas has told CW,

3   like his residence, and they can make the recorded

4   phone calls, but they cannot view that computer to

5   corroborate that information.  So they were taking all

6   the reasonable steps necessary to corroborate as much

7   as they could to inform the magistrate as to the

8   truthfulness of what CW had told.

9        Obviously, the crux of the child pornography

10   on the computer is CW's statement, and it's simply not

11   possible or not logical, reasonable, for the agents to

12   confirm that piece of information because that's what

13   they're seeking to do through search warrant, but --

14        THE COURT:  I mean, what time issue was there

15   here?  It looks to me like they could have had further

16   conversations in which she talked more specifically

17   about it.  This takes a lot of -- it's almost like

18   having a divining rod trying to find where the water

19   is in listening to this conversation.  And you're

20   reading it with a bias.

21        Your bias is, Well, she said that there was

22   child pornography.  And she saw it in May.  From that

23   then you look at this statement in E, and the

24   statements in E, I think it's reasonable to interpret

25   the second page that he's asking her to make some

1  arrangement to be able to make money out of 12 and

2  eight-year-old girls that involves pictures.  And the

3  fact that it involves money and 12 to eight-year-old

4  girls, given his propensity and demonstrated interest

5  that she testified to in the past several months, his

6  interest in child pornography, it's reasonable to

7  believe that that's what's being asked in this E, in

8  this F, but that's a different issue.

9        Yes, it proves that he's interested in child

10  pornography.  I don't think there's any question about

11  that and that he wants to make child pornography

12  pictures, but how does it then go on to inform that

13  there is likely to be on the computer in the truck

14  child pornography?  How does that work?  I don't see

15  what the nexus is here.

16        MS. MANSFIELD:  Well, I think -- well, Your

17  Honor, it works out because CW -- it is corroborating

18  the truthfulness of the statements that CW has made,

19  and, therefore, the truthfulness of the statement that

20  CW made that she saw images of child pornography on

21  Mr. Haas's laptop.

22        THE COURT:  Right.  We agree with that.  I

23  agree with that.  It certainly does show that because

24  you have a history of having seen the pictures, having

25  said other conversations, and he's always talking

1   about it, and now they have a recording of him talking

2   about how to do it.  All right.  But how do we know

3   that that computer is in that truck?  How do I -- what

4   do I make a finding on on that aspect of this case

5   because that's what this is all about?

6           MS. MANSFIELD:  Okay.  Now I understand.

7           THE COURT:  She provides no testimony or

8   evidence, nothing anybody has testified to provides

9   any evidence that the stuff she saw on the computer in

10  May was on a computer that was like the computer in

11  the truck or that would allow someone to determine,

12  well, that's the computer that we ought to be seizing.

13          MS. MANSFIELD:  Well, okay.  Going directly

14  to that question, Your Honor, as the search warrant

15  lays out in a later portion entitled, "Computers,

16  electronic storage, and forensic analysis" on page 22.

17          THE COURT:  Wait a minute.  I have to get it.

18          MS. MANSFIELD:  Yes, Your Honor.

19          THE COURT:  Page 22, paragraph 36.  All

20  right.

21          MS. MANSFIELD:  I may have gone slightly far

22  ahead, but I guess I can start here, Your Honor.

23          THE COURT:  That's his discussion of probable

24  cause.

25          MS. MANSFIELD:  Well, and it submits, Your

1    Honor, that if a computer or storage medium is found

2    on the subject property, which we're talking about

3    specifically the truck here, Your Honor, which we

4    already know at this time that there's a computer

5    there, that there is probable cause to believe that

6    the records will be stored on that computer, and it

7    goes --

8            THE COURT:  I've lost you.  Where are you?

9            MS. MANSFIELD:  I'm sorry.  That sentence

10   following it, "I submit that if a computer or storage

11   medium is found in the subject property --

12           THE COURT:  Subject property is defined as

13   the truck.

14           MS. MANSFIELD:  That's correct, Your Honor.

15   There's probable cause to believe those records will

16   be stored on that computer or storage medium for the

17   following reasons.  And this specific paragraph, Your

18   Honor, discusses essentially how long electronic files

19   can be stored, and that deleted files can be recovered

20   via forensic evidence, and I think if we even go then

21   back, Your Honor, a page -- excuse me.

22           THE COURT:  So I take from this that you're

23   saying that paragraph 36A says that if there's a

24   computer in the truck, there will be -- according to

25   his knowledge, training, and experience, the files or

1  remnants of files can be recovered.

2        MS. MANSFIELD:  That's correct, Your Honor.

3        THE COURT:  Yeah, can be recovered for months

4  after they have been downloaded.

5        MS. MANSFIELD:  And backing up slightly, Your

6  Honor, I got slightly ahead.

7        THE COURT:  I don't see how that tells us

8  anything.  I mean, it seems to me as if the officer

9  had -- the woman had said, and the affidavit

10  contained, that there was a black computer.  And let's

11  say it was a Dell.  Let's just say that.  And then you

12  find a black Dell computer in the truck.  That's one

13  thing.  And that would link what she viewed in May

14  with what was found in the truck.  The question then

15  would be staleness.  But the affidavit doesn't say

16  that.  There's nothing in here that says that the

17  computer that she saw these images on was black, nor

18  does it say the computer that was seized was black.

19  It just says the computer was seized.

20        So, you know, computers come in all shapes,

21  sizes, configurations.  Don't you need more than that

22  under *Lull* and some of these cases to provide the

23  linkage to seize that particular computer?  And if so,

24  where is it because paragraph 36A doesn't do it?  It

25  just says you can recover old images.

1          MS. MANSFIELD:  Sorry, Your Honor.  I'm

2    looking through now the paragraphs, as well the

3    background of repeaters and child pornography

4    beginning at paragraph 28, page 19 of the search

5    warrant affidavit, and discusses essentially how

6    computers have changed the production and sharing of

7    child pornography, Your Honor, and essentially the way

8    photos are taken, the way photos are shared, and the

9    way that these images can be reproduced.

10          And I believe, Your Honor, that this does go

11    to the probable cause to search essentially any

12    laptop, that there would be probable cause to search

13    any laptop found in Mr. Haas's possession.

14          THE COURT:  Once it is shown that he views

15    pornography on laptops; is that what you're saying?

16          MS. MANSFIELD:  Yes, Your Honor.  Because of

17    this information as well as going to the point I was

18    just making but probably not as clear as I could the

19    first time.

20          THE COURT:  You didn't do the brief in this

21    case, did you?

22          MS. MANSFIELD:  No, Your Honor, I did not.

23          THE COURT:  Well, the brief in this case

24    doesn't have anything in it about what you're talking

25    about.  Your argument is depending upon the particular

1  paragraphs in an affidavit which looks like a form

2  affidavit.  So you have two issues.  One is there's no

3  discussion in the government's response about the

4  issue.  And, two, what's the law on considering what

5  looked like form affidavits?

6         And Church deals with both of those.

7         MS. MANSFIELD:  Yes, Your Honor.

8         THE COURT:  Here's my take on all this:  I

9  don't know what's going on but somebody wrote a brief

10  about opposing a search warrant that wasn't -- I mean

11  defending a search on the basis of something that

12  wasn't being attacked because the government's whole

13  brief deals with the search warrant on the residence.

14         MS. MANSFIELD:  The initial brief, the

15  initial response, yes, Your Honor, that's correct.

16         THE COURT:  And then a supplemental response

17  tries to correct that, but it doesn't do what you're

18  doing.  It doesn't point back to what's in the

19  affidavit.  I just don't think that the briefing in

20  here even remotely tracks what the facts are and that

21  the issues that are being discussed are kind of being

22  discussed on the fly here.  So I think I'm going to

23  require some further briefing using the transcript.

24         MS. MANSFIELD:  Yes, Your Honor.  I would

25  appreciate that opportunity.

1           THE COURT:  I don't know what else to do.

2    Seems to me like using the transcript we need to have

3    briefing, and we'll let the defendant, whose motion it

4    is, go first.

5           I want it organized and presented in a

6    logical way.  To begin, we need to talk about what it

7    is that CW said that provides probable cause to search

8    for computers anywhere.  What it is that CW said that

9    provides probable cause to search for computers in the

10   truck.  What is the effect of the acknowledged

11   omissions respecting -- you don't have to do it in

12   this order because it's not necessarily the best way

13   to do it, but these are just topics that come to mind.

14   Then I'll defer what I was starting to talk about for

15   a minute about the effect of the omissions and say if

16   you all agree that the search warrants were identical

17   except for some add ons, let's just get a couple of

18   add ons that were made in the September 1 document.

19   You need to deal with what else provides evidence that

20   it was all right -- it was probable cause to search

21   for computers in the truck.

22          The government has pointed out a certain

23   provision.  I think it was paragraph 27E.  I'm not

24   sure.  But that's not discussed in the papers either.

25          And then you had the whole issue of whether

1  or not the magistrate judge or whether or not what was

2  not told about this woman's credibility, CW's

3  credibility, how does that affect anything in the

4  case?  The way it's being argued, sometimes you're

5  arguing it as only a component of a *Leon* good faith

6  analysis.  Sometimes you're arguing it as deficiency

7  in the warrant.

8         The defendant cites *Lull*, but is *Lull* really

9  a case that applies to the probable cause analysis or

10  is it a good faith case?  And it seems to me there's a

11  lot here that needs to be sorted out and briefed.

12         So I'd like to see some new papers, fresh new

13  papers, and don't incorporate by reference.  These

14  papers basically, as they're structured, are not of

15  great utility.

16         So when are you going to file yours, Ms.

17  Roberts?

18         MS. ROBERTS:  Your Honor, we would ask for 25

19  days.  That will allow the request of the

20  transcription of the hearing.

21         THE COURT:  Are you ordering the transcript?

22  Is that what you're saying?

23         MS. ROBERTS:  Yes, Your Honor.

24         THE COURT:  Do you want it expedited?

25         MS. ROBERTS:  No, Your Honor.

1        THE COURT:   You don't?   You think you're

2   going to get this in 25 days?

3        Ms. Daffron happens to be standing in, and

4   she has Judge Lauck she usually has to work with.   I

5   don't know what's on the agenda down there.   I don't

6   know.

7        Can it be done?   When is the soonest you can

8   get in it without expediting it I would think would be

9   one of the questions, Ms. Daffron, mindful of your

10  prior obligations to Judge Lauck?

11       THE COURT REPORTER:   Two weeks, Your Honor.

12       THE COURT:   Two weeks without expediting it?

13       THE COURT REPORTER:   Yes, sir.

14       THE COURT:   Now, what is the soonest you can

15  get it if it is expedited?

16       THE COURT REPORTER:   One week.

17       THE COURT:   One week.   Okay.

18       So now you know the parameters.   What do you

19  want to do?

20       MS. ROBERTS:   Your Honor, we will request it

21  expedited and --

22       THE COURT:   Now, have you got your calendar

23  out so you can see what you want after that?

24       MS. ROBERTS:   Your Honor, we would ask for

25  Friday, March 10th.

1          THE COURT:  Friday what?

2          MS. ROBERTS:  March 10th.

3          THE COURT:  All right.  Friday, March 10.

4      When do you want to file your response?

5  Today is what day?  This is February 8.  Okay.  So

6  then you get -- you basically are asking for 30 days?

7  Is that what you're asking for, Ms. Roberts?

8          MS. ROBERTS:  Yes, Your Honor.

9          THE COURT:  March 10th.  So what do you want

10  to do, Ms. Mansfield?

11          MS. MANSFIELD:  Your Honor, I was going to

12  ask the Court for two weeks, but I'm mindful of the

13  fact that I have a Fourth Circuit argument on the

14  23rd.  So if I could have until Monday, March 27.

15          THE COURT:  Sure, March 27.  3-10, 3-27.

16  Reply 3-31?

17          MS. ROBERTS:  Your Honor, would the Court

18  allow five days, which would actually make it April

19  3rd, which is our originally scheduled trial date?

20          THE COURT:  You mean to tell me that you say

21  that you don't work on the weekends?

22          MS. ROBERTS:  I absolutely work on the

23  weekends, Your Honor.

24          THE COURT:  Well, you didn't count the days

25  right then from the 27th.  Five days would be

```
 1    Saturday.  Not only that, you want --

 2             MS. ROBERTS:  I'd like until Monday, Your

 3    Honor.

 4             THE COURT:  The 3rd?

 5             MS. ROBERTS:  Yes, Your Honor.

 6             THE COURT:  All right.  That will be done.

 7    And I'll set up argument if I need it.  I'll look at

 8    your papers and I'll see.  All right?

 9             MS. ROBERTS:  Yes, Your Honor.

10             THE COURT:  Are you going to persist in your

11    Franks argument again?  Is there any reason to do

12    that?  There's nothing new you have to say on that, is

13    it?

14             MS. ROBERTS:  Your Honor, I'd like an

15    opportunity to just review the transcript and digest

16    everything.

17             THE COURT:  Don't run that dog out the kennel

18    anymore if you don't have any basis for doing it, will

19    you?

20             MS. ROBERTS:  Yes, Your Honor.

21             THE COURT:  All right.

22             MS. MANSFIELD:  Your Honor, just for planning

23    purposes for subpoenaing of witnesses on the

24    government's end, the defense subpoenaed for

25    April 3rd --
```

1        THE COURT:  I think that prudence would

2   dictate that in order to allow further briefing of the

3   defendant's motion, the trial will be continued

4   generally, and we will reset the trial date after we

5   know the result.

6        MS. MANSFIELD:  Thank you, Your Honor.

7        THE COURT:  But in regards to that, can you

8   go forward on the case if this motion to suppress is

9   granted?

10        MS. MANSFIELD:  Your Honor, he is

11   currently -- Mr. Haas is currently charged in Count

12   One with sex trafficking of children related to

13   information provided, but I would have to assess,

14   given that I'm fairly new to the case, there's a

15   possibility that we may still be able to go forward on

16   additional counts even if the motion is granted.

17        THE COURT:  So you're new to this.  You

18   inherited this, right?

19        MS. MANSFIELD:  That's correct, Your Honor.

20   But I'm certainly getting up to speed, but I do have

21   the knowledge of that count, and I believe that it's

22   not necessarily dependent on the evidence recovered

23   from the computer.

24        THE COURT:  Well, you want it all resolved at

25   one trial, do you, Ms. Roberts?

1          MS. ROBERTS:  Yes, Your Honor.

2          THE COURT:  All right.  We'll consider when

3   to set the whole case for a new trial date after we

4   look at this whole issue again.

5          It may be that in the coming days I may issue

6   an order further refining a little bit of what I want.

7   That doesn't mean it restricts you in what you want,

8   but it does mean that if I want something, I'd like

9   for you to address it.

10         All right?  Does that take care of everything

11  for now?

12         MS. MANSFIELD:  Yes, sir.

13         THE COURT:  Thank you very much.  We'll be in

14  adjournment.

15         (The proceedings were adjourned at 5:04 p.m.)

16

17    I, Diane J. Daffron, certify that the foregoing is

18   a correct transcript from the record of proceedings

19   in the above-entitled matter.

20

21                   /s/
     _____   _____
22    DIANE J. DAFFRON, RPR, CCR          DATE

23

24

25